IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**MARK GOUDEAU,**
*Appellant.*

---

No. CR-11-0406-AP
Filed June 17, 2016

---

Appeal from the Superior Court in Maricopa County
The Honorable Warren J. Granville, Judge
No. CR2007-005449
**AFFIRMED**

---

COUNSEL:

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Lacey Stover Gard, Chief Counsel, Capital Litigation Section, Jeffrey L. Sparks (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

David Goldberg (argued), David Goldberg Attorney at Law, Fort Collins, CO, Attorney for Mark Goudeau

---

VICE CHIEF JUSTICE PELANDER authored the opinion of the Court, in which CHIEF JUSTICE BALES, and JUSTICES BRUTINEL, TIMMER, and BERCH (RETIRED) joined.

---

VICE CHIEF JUSTICE PELANDER, opinion of the Court:

¶1          Mark Goudeau was convicted of nine counts of first degree murder, among other crimes.  This automatic appeal follows the imposition of nine death sentences and other sentences.  Ariz. R. Crim. P. 31.2(b).  We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-755, -4031, and -4033(A)(1).

## I.    FACTUAL OVERVIEW AND PROCEDURAL BACKGROUND[1]

¶2          Based on DNA evidence, the police arrested Goudeau in September 2006 for sexual assaults committed in 2005 and 2006.  Further investigation led police to suspect Goudeau's involvement in a series of murders and other crimes against thirty-three different victims in the Phoenix area between August 2005 and June 2006.

¶3          The State charged Goudeau with seventy-four felonies, including nine first degree murders for which the State sought the death penalty.  The trial court denied Goudeau's pretrial motion to sever various counts for trial.  The court later granted the State's request to divide the presentation of its guilt-phase evidence into thirteen chronological "chapters" corresponding to the dates of the offenses.

¶4          The primary issue at trial was the identity of the perpetrator. The State presented evidence that DNA from two of the murder victims was found on items seized from Goudeau's home pursuant to a search warrant; a ring belonging to another murder victim was found hidden in a shoe in Goudeau's closet; and Goudeau's DNA was found on one murder victim and several of the sexual assault victims.  At trial, seven victims identified Goudeau as their assailant.  One testified that he had seen Goudeau pointing a gun downward at a murder victim's body.  An eighth victim identified Goudeau's voice from a voice lineup.

¶5          Based on toolmark analysis of bullets and shell casings, the State's ballistics expert testified that the same .380 caliber handgun was

---

[1]      We view the facts in the light most favorable to sustaining the jury's verdicts, *State v. Cota*, 229 Ariz. 136, 141 n.2, 272 P.3d 1027, 1032 n.2 (2012).

used for all nine murders and the other charged crimes in which shell casings were found. The gun, however, was never found.

¶6        Evidence at trial also revealed that many of the crimes reflected a similar modus operandi, including the perpetrator telling victims that he had just committed a robbery and needed to reunite with his friend; wearing the same disguise; and wiping off evidence from sexual assault victims and areas he had touched before leaving the crime scenes. Additionally, the perpetrator forced all sexual assault victims to walk or drive to a secluded area, gave many of them directions, threatened to shoot them unless they complied with his demands, and told them not to look at him.

¶7        After approximately seventy days of trial that spanned seven-and-a-half-months, the jury returned guilty verdicts on sixty-seven counts, including all nine first degree murder charges. For each murder conviction, the jury found in the aggravation phase that Goudeau had been previously convicted of a life imprisonment or death-eligible offense, A.R.S. § 13-751(F)(1), of a serious offense, A.R.S. § 13-751(F)(2), and that he was on release from prison when he committed the murders, A.R.S. § 13-751(F)(7)(a). The jury further found that Goudeau committed eight of the nine murders in an especially cruel manner, A.R.S. § 13-751(F)(6), and committed four of them while committing another murder, A.R.S. § 13-751(F)(8).

¶8        During the testimony of his first mitigation witness in the penalty phase, Goudeau waived any further mitigation and presented no further evidence. He did, however, make an allocution statement. The jury returned death verdicts on all nine murder charges. This automatic appeal followed.

## II.   SUMMARY OF THE THIRTEEN CHAPTERS

¶9        As noted above, the State divided the presentation of its guilt-phase evidence into thirteen chronological "chapters." The facts of each chapter are briefly summarized below, with additional facts addressed where relevant to the issues raised on appeal.

**Chapter 1:  August 6, 2005**

¶10          In the evening of August 6, 2005, armed with a silver handgun, Goudeau approached Jenny S., Sarah U., and Jesus F., all minors at the time, and told them he had just robbed a bank, needed directions, and was waiting for a "buddy" to give him a ride.  At gunpoint, Goudeau ordered them to go to a dark, secluded area behind a church where he sexually assaulted Jenny and Sarah and then wiped them off with a towel before leaving the scene.

**Chapter 2:  September 8, 2005**

¶11          On September 8, 2005, Georgia Thompson was found dead with a gunshot wound to her head in her apartment parking lot.  A neighbor testified that she heard a woman scream, "leave me alone" followed by a gunshot, and another neighbor testified that he had also heard a woman scream that night.

**Chapter 3:  September 20, 2005**

¶12          This chapter did not directly involve the charges in this case but addressed other crimes Goudeau committed that were relevant to show his identity as the perpetrator of the crimes here.  The State introduced evidence of Goudeau's previous convictions of kidnapping, sexual assault, sexual abuse, and aggravated assault against sisters Lorena L. and Alejandra L., committed on September 20, 2005.  We describe the facts underlying those convictions when addressing Goudeau's contention that the trial court erred by admitting that other-act evidence, *infra* ¶¶ 96–102.

**Chapter 4:  September 28, 2005**

¶13          On September 28, 2005, Melissa C., Iselda H., and Martha H. were working at the take-out window of a restaurant when Goudeau pointed a gun at them and demanded money.  The three women fled to an adjoining room while Goudeau reached into the window and grabbed Melissa's purse.

¶14          Moments later, Goudeau approached Margie M. and her twelve-year-old daughter, Bianca M., who were sitting in a car parked near the take-out window.  Goudeau pointed a gun at Margie, got into the passenger seat behind her, ordered her and her daughter not to look at him,

and demanded that Margie start driving. During the drive, Goudeau talked frequently, instructing them not to look at him and telling them that his "buddy" had left him behind. At some point during the drive, he demanded $20 from Margie and sexually assaulted Bianca. Eventually, Goudeau directed Margie to pull over behind a store where he ordered her and Bianca to get undressed. He ordered Margie outside the car where he sexually assaulted her. He then told her to drive back to an area near where he had first entered the car, and once there he demanded more money. Margie gave him her coin purse. Before leaving, Goudeau used the victims' clothing to wipe down areas in the car he had touched. He left Melissa C.'s purse in the car.

**Chapter 5: November 3, 2005**

¶15　　　　On November 3, 2005, Goudeau entered a store where Teresa G. worked as a clerk, pointed a silver handgun at her head, and demanded money. Goudeau left the store after Teresa gave him money from the cash register.

¶16　　　　Shortly thereafter, Goudeau approached Any P. in a parking lot across from the store where Teresa G. worked, pointed a silver handgun at her, and demanded that she give him a ride. Goudeau sat in the front passenger seat and ordered Any to drive up and down various streets. During the drive, Goudeau told her that he had just robbed a store and that his "buddy" had left him. He then ordered her to pull over in a quiet neighborhood where he demanded that she undress, and then he sexually assaulted her. Afterward, Goudeau ordered Any to spit on her hand and rub it on the areas of her body that he had touched. Goudeau then told her to drive back to an area near the store where he had first encountered her; he took her purse and cash before leaving.

**Chapter 6: November 7, 2005**

¶17　　　　On November 7, 2005, Alfredo L. was standing in his restaurant with two employees, Marisol L. and Iris H., when Goudeau entered, brandished a silver handgun, and demanded money. Marisol and Iris fled to the back of the restaurant while Alfredo gave Goudeau money from the cash register. Goudeau then demanded and took a wallet from

Mauricio O., a customer standing by the cash register. After Goudeau left, Alfredo went outside and saw Goudeau enter an adjacent restaurant.

¶18 At the second restaurant, Goudeau pointed a silver gun at Maria L. and Jesus L., who were working the cash register, and demanded money. Jesus complied. After leaving the second restaurant, Goudeau approached Cheryl M., her mother, and her two young children, who were just getting out of a nearby car. Goudeau pointed his handgun at Cheryl and her mother and attempted to grab the mother's purse. After Cheryl told him they did not have any money, Goudeau fired a round in the air and ran off without the purse. As he did so, Mauricio O. and Pedro M., customers from the first restaurant, chased Goudeau but stopped when he shot at them.

**Chapter 7: December 12, 2005**

¶19 On December 12, 2005, Peter O. was preparing to leave work when he heard "a couple of bangs" coming from an alley behind his building. When he stepped into the alley, he saw Goudeau holding a silver gun pointed at a body on the ground. Goudeau then pointed the gun at Peter, who heard a click. Peter rushed back into the building and locked the door. The body was later identified as that of Tina Washington, who had been fatally shot in the head. Jewelry that Washington had been wearing earlier was absent from the scene.

**Chapter 8: February 20, 2006**

¶20 On February 20, 2006, Romelia Vargas and Mirna Roman were found dead, side-by-side on the floor of Vargas's food truck, each with a gunshot wound to the head. Police did not find Vargas's purse or driver's license at the scene.

**Chapter 9: March 14, 2006**

¶21 On March 14, 2006, Chao Chou and Liliana Sanchez left work together in Chou's car. Sanchez's body was later found in the front passenger seat, partially unclothed, with a fatal gunshot wound to her head. Chou's body was found in an alley a few blocks away, also with a gunshot wound to his head. Ballistics evidence indicated that both victims had been

shot inside the car, with the shooter seated in the rear passenger seat. Chou's car keys were missing and neither victim had any cash in their wallets.

**Chapter 10:  March 29, 2006**

¶22        On March 29, 2006, a business owner arriving at work noticed a parallel track of drag marks and several blood spots running from a parking lot at the front of his shop to storage sheds in the back.  Police took samples of the blood but did not locate a body.  Five days later, overwhelmed by a stench emanating from the storage shed area, the business owner moved some debris and uncovered what appeared to be human body parts.  Police moved additional debris and discovered Kristin Gibbons's mostly nude and severely decomposed body with a gunshot wound to her head.  She had bruising and scratches to her arms and legs, and her purse and cellphone were missing.

**Chapter 11:  April 10, 2006**

¶23        On April 10, 2006, Sophia Nunez's eight-year-old son came home from school and found his mother lying submerged in a bathtub, which was overflowing with water and her blood.  Nunez had been shot in the face at close range while in the bathtub.  Her shirt had been pulled up and her bra was undone.

**Chapter 12:  May 1, 2006**

¶24        On May 1, 2006, Goudeau pressed a silver handgun against Adrienne M.'s head as she sat in her car and ordered her to open the front passenger door.  After entering the car, Goudeau said he had just robbed a store and needed to meet his friend, and repeatedly told Adrienne where to drive and not to look at him.  Goudeau eventually ordered her to pull over in a secluded neighborhood and get undressed.  Goudeau then ordered her to perform oral sex on him.  When she refused, he raised his gun to her head and threatened to shoot her.  She replied, "Go ahead." Adrienne heard the gun click, grabbed her car keys, and fled from the car.

**Chapter 13:  June 29, 2006**

¶25        On June 29, 2006, Carmen Miranda was at a carwash speaking with her boyfriend on her cellphone when he overheard a male's voice demand that Miranda give him something.  Surveillance video from the carwash showed her vacuuming her car seats when Goudeau approached, pushed her into the rear seat, and then drove away in her car.  Miranda's car was found in a secluded parking lot two hours later.  Miranda was lying dead in the back seat with a gunshot wound to her face.  Her pants had been unzipped and pulled down.

## III.   ISSUES RAISED ON APPEAL

### A.  Denial of Motion to Suppress Evidence

¶26        Goudeau contends that the trial court erroneously denied his motion to suppress evidence seized during a search of his home, arguing that no probable cause supported the search warrant.  We review a trial court's ruling on a motion to suppress for abuse of discretion, *State v. Butler*, 232 Ariz. 84, 87 ¶ 8, 302 P.3d 609, 612 (2013), but review de novo its determination as to the existence of probable cause, *State v. Buccini*, 167 Ariz. 550, 556, 810 P.2d 178, 184 (1991).  We consider only the evidence presented at the suppression hearing and view the facts in the light most favorable to sustaining the court's ruling.  *State v. Manuel*, 229 Ariz. 1, 4 ¶ 11, 270 P.3d 828, 831 (2011) (citation omitted).

¶27        Following Goudeau's arrest on September 6, 2006, police sought and obtained three separate search warrants for his home.  The first was issued on the day of Goudeau's arrest and authorized police to seize, among other items, "any and all shoes to include but not limited to black shoes, white tennis shoes."  The supporting affidavit recounted facts related to the sexual assaults described in Chapters 1, 3–5, and 12, including victims' descriptions of the perpetrator's shoes, and explained that, based on DNA evidence, police suspected Goudeau of committing all those offenses.

¶28        The second search warrant was issued on September 15, 2006, and pertained only to computers and related electronic equipment in Goudeau's home not covered by the first warrant.  The second warrant was based on Goudeau's suspected involvement in sexual assaults.

**¶29** A few weeks later, police completed forensic analysis of blood discovered on a pair of tennis shoes and a ski mask seized from Goudeau's home during the September 6 search. The blood on the tennis shoes matched blood from murder victim Chao Chou (Chapter 9), and the blood on the ski mask matched blood from murder victim Kristin Gibbons (Chapter 10). In addition, ballistics testing revealed that the same gun had been used in the shootings described in Chapters 2, 6–11, and 13, including the murder of Tina Washington.

**¶30** Police obtained a third search warrant on October 6, 2006. In addition to describing the test results, the supporting affidavit noted that Washington's ten-carat yellow gold ring with her personal inscription was missing. The third search warrant authorized police to seize from Goudeau's home "any and all clothing and shoes/footwear belonging to Mark Goudeau" and a "ten carat yellow gold ring" with Washington's personalized engraving. Police found Washington's ring in a small bag tucked inside a shoe.

**¶31** Goudeau moved to suppress the shoe and the ring. In denying that motion, the trial court reasoned that the affidavit supporting the third warrant neither focused on sexual assaults nor merely repeated the first affidavit, but rather included information that led police to suspect Goudeau had committed several murders.

**¶32** The Fourth Amendment to the United States Constitution guarantees the right of all persons to be free from unreasonable searches and seizures and requires all warrants to be based on probable cause. "An officer has probable cause to conduct a search if a reasonably prudent person, based upon the facts known by the officer, would be justified in concluding that the items sought are connected with criminal activity and that they would be found at the place to be searched." *State v. Carter*, 145 Ariz. 101, 110, 700 P.2d 488, 497 (1985).

**¶33** Goudeau contends that police lacked probable cause to search his home a third time because the affidavit supporting the October 6 search warrant "failed to add anything specific regarding the Washington murder, her jewelry[,] or anything else that was not in the first two search warrant affidavits," and contained "no facts linking [Washington's murder] to

[Goudeau] or contraband to his home." But contrary to Goudeau's contentions, the third affidavit supported a reasonable inference that Washington's ring would be found in Goudeau's home. The affidavit included new information that Chou's and Gibbons's blood was discovered on items seized during the first search; that the same .380 caliber handgun had been used to kill Washington, Chou, and Gibbons; and that Washington's ring was missing. Even if ballistics evidence linking the separate murders was available before the first search, the evidence linking some of the murders to Goudeau—namely, the blood on the shoes and ski mask—was not available until after the first search. Goudeau's assertion that no gun was ever linked to him is incorrect; the blood found on the shoes and ski mask matched two murder victims who were killed by the same gun as seven other victims, including Washington.

¶34 The new information presented in the third affidavit gave rise to a fair probability that Washington's ring would be found in Goudeau's home along with shoes related to her murder and other murders described in the affidavit. *See Buccini*, 167 Ariz. at 556, 810 P.2d at 184 ("[P]robable cause exists if 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). That police had previously searched Goudeau's home for shoes related to his suspected commission of sexual assaults did not diminish probable cause to subsequently search his home for Washington's jewelry or other evidence relating to her murder. *Cf. State v. Prasertphong*, 206 Ariz. 70, 80 ¶ 29, 75 P.3d 675, 685 (2003) (holding probable cause supported second search of same vehicle when new information revealed specific location of weapon not found during first search), *rev'd on other grounds*, 541 U.S. 1039 (2004). The trial court did not abuse its discretion by denying Goudeau's motion to suppress.

### B. Consumptive DNA Testing

¶35 Goudeau argues that the trial court unconstitutionally denied him the opportunity to observe or participate in the State's DNA testing procedures that consumed certain DNA samples. We review constitutional issues de novo, *State v. Nordstrom* (*Nordstrom III*), 230 Ariz. 110, 117 ¶ 27, 280 P.3d 1244, 1251 (2012), including evidentiary rulings that implicate the

Confrontation Clause, *State v. Ellison*, 213 Ariz. 116, 129 ¶ 42, 140 P.3d 899, 912 (2006). But because Goudeau did not challenge the pre-indictment consumption on constitutional grounds, we review those claims for fundamental error. *See State v. Rutledge*, 205 Ariz. 7, 12–13 ¶¶ 28–30, 66 P.3d 50, 55–56 (2003); *see also State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

¶36 A fundamental error goes to the foundation of the case and takes from the defendant a right essential to his defense, such that the defendant could not possibly have received a fair trial. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607. The defendant bears the burden of persuasion in fundamental error review. *Id.* "To prevail under this standard of review, a defendant must establish both that fundamental error exists and that the error . . . caused him prejudice." *Id.* at ¶ 20.

¶37 Between September 2005 and September 2006, the Phoenix Police Department ("PPD") Crime Lab performed Short Tandem Repeat ("STR") DNA testing on biological samples obtained from some victims as well as items the perpetrator was believed to have touched. Goudeau's DNA was not found.

¶38 In August 2006, PPD detectives requested the Department of Public Safety ("DPS") Crime Lab to perform Y-STR testing on remaining possible DNA samples and permitted DPS analysts to consume the samples as needed.[2] DPS analysts consumed the swabs and discovered Goudeau's full Y-STR profile on swabs taken from Alejandra L. (Chapter 3), and a mixture containing his STR profile on swabs also taken from her.

¶39 Based on these results, police arrested Goudeau on September 6, 2006, and, as noted above, executed a search warrant on his house. Further testing by DPS revealed Goudeau's Y-STR profile on swabs taken

---

[2] STR DNA analysis looks at both the X and Y chromosomes for total human DNA. Y-STR DNA analysis looks only at the locations on the Y chromosome, making it a better test for samples that include a limited amount of male DNA when, as here, most of the sample contains female DNA.

from Sarah U., Jenny S., Any P., and Sophia Nunez, as well as Goudeau's partial STR profile on swabs taken from Nunez. Most of those swabs were consumed in the testing process.

¶40 As noted above, PPD Crime Lab analysts also tested items seized from Goudeau's home during the September 6 search and discovered Chao Chou's STR profile on a pair of tennis shoes and Kristin Gibbons's STR profile on a ski mask. The cuttings and swabs from the ski mask and shoes were not consumed.

¶41 After Goudeau was indicted, the State filed a motion seeking court approval to consume additional items of evidence consisting of bodily fluids collected from items of clothing connected to Goudeau or a victim. Goudeau objected on due process grounds and alternatively requested to observe or participate in the testing. The trial court granted the State's motion, overruled Goudeau's objection, and denied his request. The State later moved twice more to consume other items, and the court granted both motions over Goudeau's objections.

¶42 In total, the State requested consumptive DNA testing for twenty-nine items after Goudeau was indicted. The State tested additional portions of the shoes and ski mask seized from Goudeau's home and found Chou's and Gibbons's DNA on four items. On samples obtained from the victims, Goudeau's DNA was found on one swab from Sarah U. and one swab from Jenny S. All the tested items were consumed, but the State retained the DNA extracts for future testing.[3]

### 1. Due Process

¶43 "The Due Process Clause of the Fourteenth Amendment requires that 'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *State v. Lehr* (*Lehr III*), 227 Ariz. 140, 150 ¶ 39, 254 P.3d 379, 389 (2011) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). To safeguard this right, the Supreme Court "has developed what

---

[3] DNA extract is the purified DNA that is removed from the sample without the other parts of the cell. Any remaining DNA extract is testable.

might loosely be called the area of constitutionally guaranteed access to evidence." *Trombetta*, 467 U.S. at 485 (internal quotation marks and citation omitted).

¶44        A defendant is denied due process when the state "destroys evidence that 'both possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Lehr III*, 227 Ariz. at 150 ¶ 40, 254 P.3d at 389 (quoting *Trombetta*, 467 U.S. at 488–89). "When evidence is merely potentially exculpatory, however, the 'failure to preserve potentially useful evidence does not constitute a denial of due process of law' unless the defendant 'can show bad faith on the part of the police.'" *Id.* at 150 ¶ 41, 254 P.3d at 389 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

¶45        Because no evidence showed that the consumed items were potentially exculpatory, the question is whether the State acted in bad faith. *See id.* at 150 ¶ 42, 254 P.3d at 389. With respect to the pre-indictment consumption, Goudeau argues that because the State knew he was in jail charged with the offenses against Lorena L. and Alejandra L. and was represented by appointed counsel, due process required the State to notify him of the pending consumption. We rejected a similar argument in *Lehr III*, in which the defendant argued that the State acted in bad faith by authorizing consumptive testing without first contacting the defendant or his counsel. *Id.*

¶46        Here, as in *Lehr III*, the State retained the DNA extract for independent testing. The State's analysts also documented their procedures, and this documentation was available to the defense. Goudeau has not established fundamental error with respect to the pre-indictment consumption.

¶47        Regarding the post-indictment consumptive testing, Goudeau timely objected to the State's procedures and suggested various alternatives, including observing or videotaping the extraction process. Although *Lehr III* did not consider this precise issue (the defendant there did not object before testing and did not suggest alternatives), absent bad faith, consumptive testing does not violate due process principles. *See id.*

13

Here, there is no evidence of bad faith as the State sought and obtained prior court approval for all post-indictment consumption.

¶48    Goudeau nevertheless argues that the trial court abused its discretion and violated his due process rights by admitting into evidence the results of the State's consumptive testing.  In support, Goudeau cites the American Bar Association ("ABA") Standards for Criminal Justice, DNA Evidence § 16-3.4(e) (3d ed. 2007), which provides as follows:

> If a motion objecting to consumptive testing is filed, the court should consider ordering procedures that would permit an independent evaluation of the analysis, including but not limited to the presence of an expert representing the moving party during evidence preparation and testing, and videotaping or photographing the preparation and testing.

The trial court complied with § 16-3.4(e) when it considered and ultimately denied Goudeau's suggested procedures, finding them unnecessary and unfeasible.  Section 16-3.4(e), even were we to adopt and apply it in Arizona, requires nothing more.

¶49    Moreover, Goudeau has not identified any information he could not have obtained by reviewing the forensic analysts' notes.  We agree with other courts' views that, absent bad faith, due process does not mandate observation of DNA testing or independent testing.  *See Kansas v. Nguyen*, 833 P.2d 937, 946–47 (Kan. 1992) ("In the absence of fraud or bad faith on the part of the State and its investigative agents, due process does not require the State to invite the accused to participate in or to supervise testing procedures performed in the investigation of a crime, even where the amount of evidence to be tested is so small sufficient material will not remain to allow the defendant to conduct an independent analysis of the evidence.") (internal quotation marks and citation omitted); *California v. Griffin*, 761 P.2d 103, 107 (Cal. 1988) ("When a piece of evidence in the possession of the prosecution is destroyed because the prosecution finds it necessary to consume the evidence in order to test it, there is no due process violation.  The prosecution must be allowed to investigate and prosecute crime, and due process does not require that it forego investigation in order to avoid destroying potentially exculpatory evidence.").

14

**¶50**         Generally, a defendant's due process rights are sufficiently protected by the opportunity to cross-examine the state's expert regarding the validity of the testing procedures. *See Nguyen*, 833 P.2d at 947. This is especially so when, as here, the defendant fails to show that the opportunity to observe the extraction process would have revealed or produced exculpatory evidence. *Cf. Massachusetts v. Williams*, 919 N.E.2d 685, 695–96 (Mass. 2010) (holding that defendant was not entitled to suppression of results of DNA testing because defendant failed to make threshold showing that the inability to observe the DNA testing deprived him of exculpatory evidence).

**¶51**         In any event, the post-indictment testing did not identify Goudeau's DNA on any additional items recovered from his home or on the victims. Rather, the testing only confirmed what the pre-indictment testing showed: Goudeau's DNA was on Sarah U. and Jenny S., and Chou's and Gibbons's DNA were found on items seized from Goudeau's home. Accordingly, because the jurors would have still received essentially the same DNA evidence even if the trial court had precluded the results of the post-indictment testing, any error was harmless beyond a reasonable doubt.

### 2. Sixth Amendment

**¶52**         The Sixth Amendment guarantees criminal defendants the right to confront and cross-examine adverse witnesses. *See State v. Riggs*, 189 Ariz. 327, 331, 942 P.2d 1159, 1163 (1997). In this context, the test to determine whether a Sixth Amendment violation has occurred is whether the defendant has been prevented from presenting "information [that] bears either on the issues in the case or on the credibility of the witness." *Id.* at 331, 942 P.2d at 1163 (internal quotation marks and citation omitted).

**¶53**         Goudeau argues for the first time that the trial court's "rigid ruling prohibiting any observation of the state's extraction process . . . precluded [him] from conducting a meaningful cross examination and presenting a complete defense" in violation of the Sixth Amendment. But Goudeau's counsel cross-examined the State's forensic experts at length on their consumption processes and the details of their analysis, and he had access to all their case files. Goudeau also hired DNA experts whom he

could have called as witnesses during trial. In sum, Goudeau was not prevented from cross-examining witnesses or presenting a complete defense. The trial court did not commit fundamental error.

## C. Denial of Motion to Sever

¶54 Goudeau contends that the trial court erred by denying his motion to sever and by permitting joinder of all the counts in the indictment. Because Goudeau failed to renew the motion at or before the close of evidence, we review the severance issue for fundamental error only. *See State v. Laird*, 186 Ariz. 203, 206, 920 P.2d 769, 772 (1996); Ariz. R. Crim. P. 13.4(c).

¶55 Before trial, Goudeau moved to sever the seventy-four offenses charged in the indictment, seeking separate trials for either the thirteen different incidents or, alternatively, for the capital and noncapital charges. The trial court denied the motion, finding that "the evidence proffered for 'other acts' is for the purpose of proving identity, plan, preparation, and opportunity to commit each of the charged offenses," and that "the similarities and overlapping connections that the State has proffered . . . make it more likely than not that defendant committed the charged offenses." The court further found that the other-act evidence "ha[s] a probative value that is not substantially outweighed by danger of unfair prejudice and not cumulative."

¶56 The trial court also found that "[t]he commission of sexual assaults including oral and vaginal sex against strangers provides a reasonable basis to infer that defendant has a character trait giving rise to an aberrant sexual propensity to commit the crimes charged," and that "the evidentiary value of proof of the 'other acts' is not substantially outweighed by dangers of Rule 403."

¶57 Two or more offenses may be joined in an indictment if they "[a]re of the same or similar character," "[a]re based on the same conduct or are otherwise connected together in their commission," or "[a]re alleged to have been a part of a common scheme or plan." Ariz. R. Crim. P. 13.3(a)(1)–(3). On a party's motion, the court must sever joined offenses if "necessary to promote a fair determination of the guilt or innocence of any

16

defendant of any offense." Ariz. R. Crim. P. 13.4(a). A defendant is also entitled to severance if, as here, the offenses are joined only because they are of the same or similar character, "unless evidence of the other offense[s] . . . would be admissible under applicable rules of evidence if the offenses were tried separately." Ariz. R. Crim. P. 13.4(b); *see also State v. Aguilar*, 209 Ariz. 40, 51 ¶ 38, 97 P.3d 865, 876 (2004) ("A denial of a motion to sever under Rule 13.4(b) is reversible error only if the evidence of other crimes would not have been admitted at trial for an evidentiary purpose anyway." (internal quotation marks and citation omitted)).

**¶58** Arizona Rule of Evidence 404(b) generally precludes the admission of "evidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." But other-act evidence may be admitted for other purposes, such as proving the identity of the perpetrator of the charged offense, Arizona Rule of Evidence 404(b), provided that "the evidence is relevant and the potential for prejudice does not substantially outweigh its probative value," *State v. (Pete J.) VanWinkle*, 230 Ariz. 387, 393 ¶ 21, 285 P.3d 308, 314 (2012) (citing Ariz. R. Evid. 403). "The identity exception to [Rule] 404(b) applies if identity is in issue, and if the behavior of the accused both on the occasion charged and on some other occasion is sufficiently distinctive, then proof that the accused was involved on the other occasion tends to prove his involvement in the crime charged." *State v. Stuard*, 176 Ariz. 589, 597, 863 P.2d 881, 889 (1993) (internal quotation marks and citations omitted). "[T]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." *Id.* (internal quotation marks and citation omitted); *see also State v. Roscoe* (*Roscoe II*), 184 Ariz. 484, 491 n.2, 910 P.2d 635, 642 n.2 (1996) ("Identity and modus operandi are obviously closely related, if not identical, since an unrelated act with a significantly similar modus operandi may identify the defendant as the person who committed the crime charged."). "While identity in every particular is not required, there must be similarities between the offenses in those important aspects when normally there could be expected to be found differences." *State v. Roscoe* (*Roscoe I*), 145 Ariz. 212, 216, 700 P.2d 1312, 1317 (1984) (internal quotation marks and citation omitted).

**¶59** In addition to Rule 404(b), in criminal trials for sexual offenses, Rule 404(c) allows the admission of other-act evidence "if relevant

to show that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the offense charged." Ariz. R. Evid. 404(c). Before admitting evidence under Rule 404(c), the trial court must make specific findings with respect to three aspects of the proffered evidence. *Aguilar*, 209 Ariz. at 49 ¶ 30, 97 P.3d at 874. First, the court must find by clear and convincing evidence that the defendant committed the other act. *Id.* Second, it "must find that the commission of the other act provides a reasonable basis to infer that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the charged sexual offense." *Id.* Third, it "must find that the evidentiary value of proof of the other act is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or other factors mentioned in Rule 403." *Id.* In making the final determination, the court must consider the factors listed in Rule 404(c)(1)(C)(i)–(viii). *Id.*

**¶60** Here, in reviewing the trial court's finding that the other-act evidence would have been cross-admissible under Rules 404(b) or (c) in a trial on any chapter had they been severed, we consider only the evidence before the court when it ruled on the motion to sever. *See State v. (Melinda) VanWinkle*, 186 Ariz. 336, 339, 922 P.2d 301, 304 (1996) ("In considering whether the trial court erred in denying a motion to sever, we are mindful that the trial court exercises considerable discretion in determining whether, *in light of the evidence then before the court*, the defendant has made the requisite showing of prejudice." (emphasis added)). Goudeau overlooks this important limitation, instead citing only evidence admitted *after* the court had denied his motion.[4] Indeed, the parties agreed that the trial court would rule on Goudeau's pretrial motion to sever based on the pleadings, and the court's ruling repeatedly notes, "[f]or purposes of this motion only, defendant has not objected to the State's proffer." Based on the State's proffer (the only evidence available at the time of the court's ruling), we find no fundamental error in the court's denial of the motion to

---

[4] In a post-trial motion for a new trial, Goudeau again objected to joinder of the counts, but at that point the argument was untimely and the trial court did not err by denying it. *See* Ariz. R. Crim. P. 13.4(c) (defendant must renew denied motion to sever "at or before the close of the evidence," because otherwise "[s]everance is waived").

sever.

**¶61** Identity was the only disputed issue in this case, and the State could properly introduce other-act evidence to prove that Goudeau committed the crimes. The similarity of attributes and actions of the perpetrator in the different chapters tended to show that the offenses were also of the same or similar character for purposes of joinder under Rule 13.3(a)(1); and the State proffered many similarities among the chapters supporting the trial court's finding that Goudeau was more likely than not the perpetrator.

**¶62** First, the State proffered evidence that the same gun was involved in Chapters 2, 6, 7, 8, 9, 10, 11, and 13, although the gun itself was never found. *Cf. New Jersey v. Sterling*, 71 A.3d 786, 802 (N.J. 2013) (permitting other-crimes evidence "on the issue of identity when a particular weapon . . . used in one crime connects a defendant to another offense"). The State further proffered that several victims described that gun as silver- or chrome-colored.

**¶63** Second, DNA evidence linking Goudeau to murder victims Chao Chou (Chapter 9) and Kristin Gibbons (Chapter 10) was discovered in Goudeau's home, Goudeau's DNA was found on murder victim Sophia Nunez's body (Chapter 11), and DNA evidence implicating Goudeau was found on sexual assault victims Jenny S. (Chapter 1), Sarah U. (Chapter 1), and Any P. (Chapter 5). *Cf. United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000) ("DNA evidence alone overwhelmingly establishes that [the defendant] was one of the individuals [who committed the crime]."). Police also found murder victim Tina Washington's missing jewelry in Goudeau's home (Chapter 7).

**¶64** Third, Goudeau's modus operandi was similar in several ways across the various crimes, including telling victims that he had just committed a robbery and needed to reunite with his "buddy"; wearing the same disguise for the crimes described in Chapters 4, 5, and 6; and wiping off victims and areas he had touched before leaving the crime scene. Additionally, Goudeau made all the surviving sexual assault victims walk or drive to a secluded area, gave many of them directions, threatened to shoot them unless they complied with his demands, and told them not to

look at him. *Cf. Missouri v. McKinney*, 314 S.W.3d 339, 341 (Mo. 2010) (discussing that offenses might be connected for joinder purposes by similarities in the manner in which they were committed).

¶65 The State's proffered other-act evidence from the individual chapters supported the trial court's finding that such evidence would have been cross-admissible under Rule 404(b) on the issue of identity in the other chapters had they been severed for trial. *See State v. Fierro*, 107 Ariz. 479, 482–83, 489 P.2d 713, 716–17 (1971) (holding other-act evidence of wearing similar disguise and using similar modus operandi admissible and sufficient to prove identity). All chapters bore a sufficient evidentiary connection to one another to implicate Goudeau as the perpetrator, whether through use of the same gun, DNA evidence, or similar modus operandi, even though in some chapters the ultimate crimes were different. *See Stuard*, 176 Ariz. at 597–99, 863 P.2d at 889–91. Viewed together, the other-act evidence from each chapter was admissible to prove identity for all offenses.

¶66 Contrary to Goudeau's argument, the trial court considered the factual differences among the crimes, including that the victims' descriptions of the perpetrator varied and that his modus operandi was not identical. But in light of the significant similarities proffered by the State, the court did not err in implicitly finding that the charged crimes were of the "same or similar character" and thus properly joined. Ariz. R. Crim. P. 13.3(a)(1). And because identity was the only disputed issue at trial, the court did not err by finding the other-act evidence relevant. Nor has Goudeau established that the trial court abused its discretion in finding the probative value of that evidence is not substantially outweighed by the potential for unfair prejudice. In sum, based on the evidence before the trial court when it denied Goudeau's pretrial motion to sever, the court did not fundamentally err.

¶67 Finally, Goudeau's argument also fails because he cannot establish prejudice. "When a defendant challenges a denial of severance on appeal, he 'must demonstrate compelling prejudice against which the trial court was unable to protect.'" *State v. Murray*, 184 Ariz. 9, 25, 906 P.2d 542, 558 (1995) (quoting *State v. (Robert C.) Cruz*, 137 Ariz. 541, 544, 672 P.2d 470, 473 (1983)); *see also Henderson*, 210 Ariz. at 567 ¶¶ 19–20, 115 P.3d at 607

(defendant must establish prejudice to prevail on fundamental error review). Goudeau "cannot show such prejudice because the trial court instructed the jurors to consider each charged offense separately and advised them that the State had to prove each beyond a reasonable doubt." *State v. Hausner*, 230 Ariz. 60, 75 ¶ 48, 280 P.3d 604, 619 (2012). We presume jurors follow the court's instructions. *State v. (Gilbert) Martinez*, 230 Ariz. 208, 216 ¶ 40, 282 P.3d 409, 417 (2012). The record in this case bears out that presumption as the jury acquitted Goudeau of four of the charges and hung on the charge of sexual assault committed against murder victim Sophia Nunez (Chapter 11). On this record, we reject Goudeau's contentions that joining the offenses for trial constituted fundamental error or otherwise violated his rights under the Eighth or Fourteenth Amendments.

### D. Right to Counsel

¶68 Goudeau contends that he was constructively denied his right to counsel because the trial court failed to sufficiently address an irreconcilable conflict and the lack of communication between him and his attorneys. We review a trial court's denial of a request for new counsel for abuse of discretion. *State v. Hernandez*, 232 Ariz. 313, 318 ¶ 11, 305 P.3d 378, 383 (2013). A trial court abuses its discretion by summarily denying a motion for change of counsel without inquiring into the "specific factual allegations that raised a colorable claim that [the defendant] had an irreconcilable conflict with his appointed counsel." *State v. Torres*, 208 Ariz. 340, 343 ¶ 9, 93 P.3d 1056, 1059 (2004).

¶69 Four times during the trial court proceedings, Goudeau requested an ex parte hearing to discuss the alleged lack of communication with counsel and their allegedly inadequate investigation. The first hearing, held on July 21, 2009, was attended by Goudeau and his two attorneys, Randall Craig and Rodrick Carter. During the hearing, Goudeau complained that his counsel failed to obtain cellphone tower records, allowed the State to consume DNA swabs, and had given him only half of the police reports. Goudeau indicated that he liked both attorneys, but he worried they were ignoring his investigation requests and would not be ready for trial.

¶70 In response, the trial court explained that the cellphone

company had destroyed the records and that defense counsel had objected to DNA consumption. The court further explained that defense attorneys frequently withhold their clients' files because of concerns that other inmates might obtain them and become state witnesses. The court also addressed the communication issue.

¶71        Despite his complaints, Goudeau stated that he thought he and counsel could "work it out," and only requested that the court "ask them to step it up a little bit." Based on Goudeau's presentation, the court concluded that he could "continue to communicate" with counsel and ordered counsel to take note of Goudeau's concerns.

¶72        On April 6, 2010, Goudeau, his attorneys, and his investigator, Art Hanratty, attended a second ex parte hearing. Goudeau again voiced frustration at his attorneys' purported lack of communication and investigation. When directly asked if he wanted the court to do anything, however, Goudeau responded by stating: "I want to keep my counsel, but I want them to fight." After hearing Goudeau's concerns, the trial court concluded that Goudeau wanted to continue with current counsel.

¶73        Six months later, on October 14, 2010, a third ex parte hearing was held after Goudeau filed a motion to determine counsel. This time, Goudeau was more adamant that there were "serious issues" between him and his attorneys. He complained that there was still no communication, no disclosure, and no investigation of his alibi witnesses and defenses. He stated that he had "absolutely no faith" in his attorneys, the animosity and tension between them made it "impossible to communicate," he did not believe reconciliation was possible, and he was "actually asking for new counsel." Goudeau then discussed a number of items he wanted defense counsel to complete.

¶74        The trial court questioned the defense team members about their ability to effectively represent Goudeau and, "recognizing the very specific concerns Mr. Goudeau has expressed," whether they could continue to communicate with him. Both defense attorneys, as well as the mitigation specialist, Steve Johnson (also a lawyer), assured the court that they could and would effectively represent Goudeau but expressed concerns about being ready for the January 2011 scheduled trial. Craig,

Johnson, and Hanratty also stated that they could continue to communicate with Goudeau. Ultimately, Goudeau relented, telling the court he did not want to start over, and he was willing to work with counsel if they agreed to provide him with everything he requested.

¶75        Following Goudeau's response, the trial court denied the motion to determine counsel, finding that Goudeau's complaints did not give rise to a Sixth Amendment violation. The trial date, however, was continued for several months, allowing more time for the defense to prepare and work with Goudeau.

¶76        The trial began on April 19, 2011. On May 18, toward the end of jury selection, the court held its final ex parte hearing on counsel-related issues. Again, Goudeau raised concerns about his attorneys, mainly focusing on a purported lack of preparation. Goudeau nonetheless stated that he believed that his attorneys were "good trial attorneys," and that he was not asking the court to displace them. Addressing Goudeau's concerns, the trial court explained the role of counsel in criminal proceedings, discussed various motions and trial procedures, and noted that Goudeau and counsel seemed to be communicating well throughout the jury selection process. Goudeau again affirmed that he would continue to work with his attorneys and did not expressly complain further about his counsel during the trial's long guilt phase.

¶77        The federal and Arizona Constitutions guarantee criminal defendants the right to representation by counsel. U.S. Const. amend. VI; Ariz. Const. art. 2, § 24; *see* A.R.S. § 13-114(2). Although this right includes the right to competent counsel, *State v. LaGrand*, 152 Ariz. 483, 486, 733 P.2d 1066, 1069 (1987), a defendant is not entitled to "counsel of choice, or to a meaningful relationship with his or her attorney," *Torres*, 208 Ariz. at 342 ¶ 6, 93 P.3d at 1058 (internal quotation marks and citation omitted).

¶78        Nonetheless, "when there is a complete breakdown in communication or an irreconcilable conflict between a defendant and his appointed counsel, that defendant's Sixth Amendment right to counsel has been violated." *Id.* An erroneous denial of a request to change counsel deprives a defendant of his Sixth Amendment right to counsel and requires automatic reversal. *State v. Moody* (*Moody I*), 192 Ariz. 505, 509 ¶ 23, 968

P.2d 578, 582 (1998).

**¶79**         To preserve a defendant's right to counsel, trial courts are required to inquire on the record about the basis of a defendant's request for new counsel "[w]hen a defendant raises a seemingly substantial complaint about counsel." *Torres*, 208 Ariz. at 343 ¶ 7, 93 P.3d at 1059 (alteration in original) (quoting *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991)). The nature and scope of the inquiry required depends on the nature of the defendant's request. *Id.* at ¶ 8. Although "generalized complaints about differences in strategy may not require a formal hearing or an evidentiary proceeding," *id.*, if a defendant sets forth "sufficiently specific, factually based allegations in support of his request for new counsel," the court "must conduct a hearing into his complaint," *id.* (quoting *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002)). "Likewise, if the defendant makes specific allegations when requesting new counsel, the trial court should elicit specific on-the-record responses to the allegations from defense counsel." *Hernandez*, 232 Ariz. at 320 ¶ 31, 305 P.3d at 385.

**¶80**         If the trial court probes a defendant's request for substitute counsel, the defendant bears the burden of demonstrating either a "total breakdown in communication" or an "irreconcilable conflict with his attorney." *Torres*, 208 Ariz. at 343 ¶ 8, 93 P.3d at 1059. "To satisfy this burden, the defendant must present evidence of a 'severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible.'" *Hernandez*, 232 Ariz. at 318 ¶ 15, 305 P.3d at 383 (quoting *Lott*, 310 F.3d at 1249).

**¶81**         Goudeau contends that the trial court's inquiry into his request for new counsel (a request made at only the October 2010 hearing) was "constitutionally insufficient" in light of the record in this case. He argues that this Court should reverse, or alternatively, remand the case for a more extensive evidentiary hearing on his claims.

**¶82**         We addressed a similar argument in *Hernandez*, 232 Ariz. at 318 ¶ 16, 305 P.3d at 383. There, the defendant alleged that his counsel had visited him in jail only four times in over two years and had never spoken

with him about his case. *Id.* Although we found that the defendant "raised sufficiently specific factual allegations to warrant an inquiry," we concluded that the trial court's inquiry was sufficient. *Id.* at 320 ¶ 29, 305 P.3d at 385.

¶83  The trial court's inquiry in this case was likewise sufficient. As discussed above, *supra* ¶¶ 69–76, the court adequately addressed Goudeau's complaints in each of the three pre-trial ex parte hearings. Goudeau asked for new counsel only at the third hearing in October 2010, but after further discussion with the court and his defense team, he essentially withdrew his request and agreed to continue working with his counsel.

¶84  Finally, because Goudeau's complaints during the May 18, 2011 hearing were, at bottom, related to counsel's strategic decisions, the trial court was not required to elicit on-the-record responses from defense counsel. *See Torres*, 208 Ariz. at 343 ¶ 8, 93 P.3d at 1059 ("[G]eneralized complaints about differences in strategy may not require a formal hearing or an evidentiary proceeding."); *see also State v. Cromwell*, 211 Ariz. 181, 187 ¶ 30, 119 P.3d 448, 454 (2005) ("To constitute a colorable claim, a defendant's allegations must go beyond personality conflicts or disagreements with counsel over trial strategy.").

¶85  The trial court regularly observed the interaction between Goudeau and his attorneys during the nearly four years of pretrial proceedings, including hearings and multiple conferences devoted to examination of Goudeau's relationship with his lawyers. Additionally, Goudeau and his counsel met privately several times to discuss his case. In sum, Goudeau has not established a complete breakdown in communication or irreconcilable conflict with his counsel. Contrary to Goudeau's assertions, neither "the scope of the hearings" nor the nature or extent of the trial court's "inquiry" were "constitutionally insufficient," and the court did not effectively deprive Goudeau of his constitutional right to counsel.

### E. Multiple Opening Statements

¶86  Goudeau asserts that he was deprived of a fundamentally fair

trial when the trial court permitted the State to make a separate opening statement for each of the thirteen chapters. We review a trial court's decision on the mode and order of trial for abuse of discretion, *see Gamboa v. Metzler*, 223 Ariz. 399, 402 ¶ 13, 224 P.3d 215, 218 (App. 2010), but review de novo the interpretation of court rules, *State v. Fitzgerald*, 232 Ariz. 208, 210 ¶ 10, 303 P.3d 519, 521 (2013).

**¶87** During a pretrial case management conference, the State noted its intent to present evidence of the charged crimes in chronological order and suggested the possibility of "mini opening statements" before each segment, "as opposed to one three-hour long statement." Goudeau objected, but the trial court observed that mini-opening statements could make the trial less complicated and the evidence more understandable for the jurors. After Goudeau objected again and the parties briefed the issue, the court granted the State's request.

**¶88** Before any evidence was presented, the trial court instructed the jury that statements and arguments of counsel are not evidence. The State made thirteen opening statements corresponding with the chapters. Goudeau made opening statements on some chapters, but reserved opening statements on others. Before the State's second opening statement, the court reiterated that "each [opening] will be separate and there would be no use of one opening to use as a close for another." At the close of evidence, the court again instructed the jury that what counsel said during opening statements and closing arguments was not evidence.

**¶89** Goudeau asserts that Arizona Rule of Evidence 611(a) does not authorize the trial court to allow multiple opening statements and that doing so violates due process and Arizona Rule of Criminal Procedure 19.1(a). We conclude that although Evidence Rule 611(a) does not address the issue, Criminal Procedure Rule 19.1(a) and the court's inherent authority authorized the court to permit the procedure, which comported with due process principles.

**¶90** Rule 611(a) provides:

The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:

> (1) make those procedures effective for determining the truth;
> (2) avoid wasting time; and
> (3) protect witnesses from harassment or undue embarrassment.

Ariz. R. Evid. 611(a).[5] That rule applies to the presentation of witnesses and evidence and does not plainly authorize a court to permit sequential "mini" opening statements, as occurred here. But Rule 611(a) does not preclude this procedure.

**¶91** Arizona Rule of Criminal Procedure 19.1(a) prescribes the order of trial proceedings "unless otherwise directed by the court," thereby authorizing the court to vary the order. *Cf. State v. Guerrero*, 159 Ariz. 568, 571, 769 P.2d 1014, 1017 (1989) (observing that Rule 19.1(a) "contemplates the possibility of a different order of proceedings"). Thus, contrary to Goudeau's argument, Rule 19.1(a) implicitly authorized the trial court to "otherwise direct" the order of proceedings by allowing sequential, mini-opening statements.

**¶92** Additionally, "[t]rial judges have inherent power and discretion to adopt special, individualized procedures designed to promote the ends of justice in each case that comes before them." *Hedlund v. Sheldon*, 173 Ariz. 143, 146, 840 P.2d 1008, 1011 (1992) (quoting *State v. Lambright*, 138 Ariz. 63, 78, 673 P.2d 1, 16 (1983) (Feldman, J., specially concurring)); *accord Pool v. Superior Court*, 139 Ariz. 98, 103–04, 677 P.2d 261, 266–67 (1984) ("The trial judge is armed with both discretionary power and rules which he may use to control proceedings."); Fed. R. Evid. 611 advisory committee's note

---

[5] Rule 611(a) was amended after Goudeau's trial. *See* Ariz. R. Evid. 611 cmt. to 2012 amend. We cite the current version because the changes did not materially alter the rule. *See id.* (noting the changes "are intended to be stylistic only").

to 1972 amend. ("The ultimate responsibility for the effective working of the adversary system rests with the judge."). Given the length and complexity of this trial—which involved seventy-four counts involving thirty-two victims and lasted seven-and-a-half-months—the trial court did not abuse its discretion in permitting brief opening statements before each chapter.

¶93 Goudeau's due process argument is also unavailing. "A trial judge must control the courtroom to help ensure a fair trial" and "must refrain from taking any action calculated to influence the jury or likely to prejudice the defendant," but "[w]ithin reason, a judge does not display bias or cause prejudice when acting sua sponte to control the courtroom and the trial." *State v. Bible*, 175 Ariz. 549, 595, 858 P.2d 1152, 1198 (1993).

¶94 Here, the trial court reasonably permitted the parties to make brief opening statements before each chapter to orient jurors to the pertinent facts that would be presented and to assist in their understanding of the evidence. *See State v. King*, 180 Ariz. 268, 278, 883 P.2d 1024, 1034 (1994) ("Opening statements are intended to inform the jury of what the party expects to prove and prepare the jury for the evidence that is to be presented."). Goudeau had that opportunity and exercised it several times.

¶95 Moreover, there is no indication that the court's ruling was either designed or likely to cause prejudice. On the contrary, the court emphasized in its ruling that it "would not allow either party to try to remind the jurors of what they think they should have heard last week. It would always be an opening statement of anticipated evidence for the next chapter." Toward the end of the trial, the court admonished the State to "stay with one chapter at a time" in its opening statements. Finally, the court twice instructed the jury that counsels' opening statements and arguments were not evidence, and we presume that the jurors followed those instructions. *State v. Newell*, 212 Ariz. 389, 403 ¶ 68, 132 P.3d 833, 847 (2006). The trial court's order did not violate due process.

## F. Admission of Other-Act Evidence

¶96 Goudeau argues that the trial court erred in admitting other-act evidence that he kidnapped and assaulted sisters Lorena L. and

Alejandra L. (Chapter 3).  We review a trial court's admission of other-act evidence for abuse of discretion.  *Hausner*, 230 Ariz. at 78 ¶ 68, 280 P.3d at 622.  "When the State seeks to admit evidence of other acts of the defendant, it must prove by clear and convincing evidence that the defendant committed the other acts; they must be offered for a proper purpose; they must be relevant; and, consistent with Rule 403, their probative value must not be substantially outweighed by the danger of unfair prejudice."  *Id.* at 78 ¶ 69, 280 P.3d at 622.

¶97        In another case, a jury found Goudeau guilty of the September 2005 kidnapping, sexual assault, sexual abuse, and aggravated assault of the two sisters.[6]  The evidence at that trial showed that Goudeau, wearing a baseball hat pulled low, tan pants, boots, and a long sleeved orange shirt, had approached the sisters on the street while armed with a silver handgun.  He told the sisters he had just robbed a store, instructed them not to look at his face, and ordered them to walk behind a bush, where he sexually assaulted both.  Goudeau tried to destroy trace biological evidence, but he left DNA evidence on Alejandra's breast.  The State relied on the sisters' in-court identifications as well as DNA evidence to convict Goudeau.

¶98        Before trial in the instant case, the State filed a notice of intent to introduce evidence of Goudeau's crimes against the sisters, pursuant to Evidence Rules 404(b) and (c), to show identity and modus operandi, as well as sexual propensity to commit the charged offenses.  Goudeau conceded that his convictions established the prior acts and that the proffered evidence was relevant, but argued that the acts were not sufficiently similar to the crimes charged in this case.  He noted the discrepancy in victims' descriptions of the suspect and the varying disguises worn in committing the offenses.  In a detailed minute entry, the trial court granted the State's request under both Rules 404(b) and (c), finding substantial similarities between the crimes and that the probative value of the evidence was not substantially outweighed by the danger of

---

[6]        The court of appeals affirmed Goudeau's convictions and related sentences.  *State v. Goudeau*, 1 CA-CR 07-1069, at *1 ¶ 1 (App. Dec. 17, 2009) (mem. decision).

unfair prejudice.

**¶99** The trial court did not abuse its discretion in admitting evidence of the prior crimes against the sisters under Rule 404(b) to prove identity of the perpetrator, based on the similarities described in the court's minute entry: the perpetrator (1) told the victims he had just committed a robbery and was waiting for a friend; (2) was armed with a silver handgun; (3) moved the victims from one point to another secluded area, where he had them disrobe; (4) wore something to make identifying him difficult; (5) told the victims not to look at his face; (6) committed a sexual act; and (7) attempted to destroy physical evidence. At trial, the State introduced much of the same evidence that was presented in the prior trial, including both sisters' in-court identifications of Goudeau as their assailant, as well as the DNA evidence.

**¶100** Focusing on certain dissimilarities among the offenses and variations in victims' descriptions of the assailant, Goudeau asserts that many of the "similarities" identified by the trial court occur in most kidnappings and sexual assaults, and that the similarities did not exist in every charged sexual assault where the victims survived. But sufficient similarities existed to warrant admission of the evidence under Rule 404(b). *Cf. State v. Valles*, 162 Ariz. 1, 5, 780 P.2d 1049, 1053 (1989) (finding evidence of prior robbery admissible under Rule 404(b) when both robberies occurred around the same time and bore sufficient similarities in the way the defendant distorted his appearance, carried a gun, and demanded money from a back room safe); *Fierro*, 107 Ariz. at 482–83, 489 P.2d at 716–17 (evidence of subsequent rape admissible because two crimes bore sufficient similarities in the way the defendant wore a mask and gloves, carried a gun, and tied both victims up and raped them). As we stated in *Bible*:

> Absolute identity in every detail cannot be expected. Where an overwhelming number of significant similarities exist[s], the evidence of the prior act may be admitted. The term "overwhelming" does not require a mechanical count of the similarities but, rather, a qualitative evaluation. Are the two crimes so similar, unusual, and distinctive that the trial judge could reasonably find that they bear the same signature? If

so, the evidence may be admissible and any dissimilarities go
to its weight.

175 Ariz. at 576, 858 P.2d at 1179 (internal quotation marks and citation
omitted).

¶101     For the purpose of proving identity, the trial court noted
several meaningful similarities between Goudeau's crimes against the
sisters and the charged incidents in this case involving a surviving victim.
The court did not abuse its discretion in finding that the probative value of
evidence of those prior crimes and of the DNA match was not substantially
outweighed by a danger of unfair prejudice, the evidence was not
cumulative, and any prejudicial effect could be ameliorated with
appropriate jury instructions.  Finally, the court instructed the jury on how
to evaluate the other-act evidence before it was presented and again before
closing arguments.

¶102     The trial court did not abuse its discretion in admitting the
other-act evidence under Rule 404(b).  In light of our conclusion, we need
not address whether the other-act evidence was also admissible under Rule
404(c).

### G.  Admission of Pretrial and In-Court Identifications

¶103     Goudeau argues that the trial court deprived him of due
process and abused its discretion in permitting in-court identifications of
him by seven victims and one in-court voice identification by another
victim.  We review the reliability and fairness of a challenged identification
for abuse of discretion.  *State v. Lehr* (*Lehr I*), 201 Ariz. 509, 520 ¶ 46, 38 P.3d
1172, 1183 (2002).   We consider only the evidence presented at the
suppression hearing and defer to the trial court's factual findings unless
clearly erroneous, but we review de novo the "ultimate question" of the
constitutionality of a pretrial identification.  *See State v. Garcia*, 224 Ariz. 1,
7–8 ¶ 6, 226 P.3d 370, 376–77 (2010).

### 1.  Identification Testimony at Trial

#### a.  Jenny S. (Chapter 1)

31

¶104     On August 6, 2005, the day she was assaulted, Jenny S. described her assailant as a "black male, 5'7", heavyset," wearing a baseball hat, t-shirt, and jeans. She reported that "it was dark," and "she never looked at his face." In the days that followed, she twice told police that she could not identify her assailant, and in October 2005, she failed to identify anyone from a photo array that did not contain Goudeau's photo.

¶105     When police arrested Goudeau on September 6, 2006, his photograph was given "wide release" by the media. Jenny admitted to seeing his photo and a composite sketch on television multiple times. On July 26, 2008, police again interviewed Jenny, who reiterated that she did not see her assailant's full face during the assault because he was wearing a hat. Jenny stated that she recognized Goudeau from television "a little bit," but thought she came to recognize him as her assailant when she saw him sitting in court at a preliminary hearing. She reported that Goudeau was wearing a white long sleeve button-up shirt and tie at that hearing. At one point during the interview, Detective Femenia asked Jenny what she thought when she saw Goudeau's photo on television. Jenny replied that she was "happy [be]cause they got him," and Detective Femenia said "Good."

¶106     Before trial, Goudeau moved to preclude Jenny's in-court identification and asked the court to make its determination "based on the pleadings and attachments only." He conceded that the State was not responsible for the media presentation of his photo but argued that Detective Femenia bolstered Jenny's identification at the July 26 interview.

¶107     The trial court denied Goudeau's motion, agreeing with the State that no state action affected Jenny S.'s pretrial identification that would require precluding her identification testimony at trial. The court reasoned that Detective Femenia's response was in "support of the victim's relief rather than any affirmation of her identification," and that the State was not responsible for the media exposure or Jenny's attendance at the preliminary hearing. The court ruled that Goudeau could attempt to impeach her with prior statements and present the circumstances of the media exposure at trial and would be entitled to an identification jury

instruction.[7]

**¶108**      Jenny identified Goudeau as her assailant at trial. She was subsequently cross-examined on her identification, including that she could not recall the details of her description immediately after the offense, was told by her mother that the police had caught a suspect, and had seen Goudeau on television.

### b.  The Sisters, Lorena L. and Alejandra L. (Chapter 3)

**¶109**      Before the prior trial in the sisters' case, Goudeau moved to prohibit the State from asking either of them to identify Goudeau in court. Thereafter, a *Dessureault* hearing was held to determine the admissibility of their in-court identifications in that case. *See State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969). Here, the trial court resolved the same issue based on its review of the transcripts from the prior hearing.

**¶110**      At the prior hearing, Lorena L. identified Goudeau as her assailant, noting that she recognized his complexion and "[t]he eyes." She testified that she saw her assailant's face a few times during the assault and described him a few days later as a muscular black male with a thin mustache, approximately six feet tall, and around thirty years old.

**¶111**      Lorena acknowledged her inability to identify anyone in three photographic lineups, one of which contained Goudeau's photo. She further stated that she did not identify Goudeau until she saw his arrest on television and recognized his expressions and the way he walked. She testified that seeing him on television made it "easier for [her] to see him today." She also said that Detective Vasquez told her before the hearing that police arrested Goudeau because he was linked to her case.

---

[7]      The trial court ultimately gave not only a standard jury instruction regarding testimony of witnesses generally, but also a separate instruction specifically on eyewitness identifications. *See State v. Nottingham*, 231 Ariz. 21, 27 ¶ 16, 289 P.3d 949, 955 (App. 2012) (noting that when requested a trial court must separately and specifically instruct the jury on eyewitness identification when it is at issue in the case).

¶112     Based on her testimony, the trial court in the prior case noted three possible scenarios.  Lorena identified Goudeau (1) based strictly on her memory of the assault; (2) based on her memory of the assault, but also influenced by what she saw on television; or (3) based solely on what she saw on TV.  When asked which of the three scenarios most closely matched her belief, Lorena responded "[t]he first."

¶113     Alejandra L. also identified Goudeau during the earlier *Dessureault* hearing.  She testified that she was very close to her assailant for about an hour and got a good look because of the lighting.  Alejandra described him as a light-skinned African-American with a medium build, approximately six feet tall, and twenty-five to thirty years old.  On March 27, 2006, she selected a different individual from a photo array that included Goudeau, rating her confidence level as a seven out of ten.  Although she admitted to seeing Goudeau's composite sketch and photo on television and recognizing his face, she maintained that she identified Goudeau "[b]ecause of what happened to me."

¶114     By admitting the sisters' other-act testimony over Goudeau's objection, *supra* ¶ 98, the trial court implicitly allowed the sisters to identify him at trial in this case, and both of them did so.  They were cross-examined on details of their identifications, including their prior statements.

### c.   Margie M. (Chapter 4)

¶115     On September 28, 2005, Margie M. told police that her assailant was in her car "for well over a half an hour," and "talked continually."  Because she did not see his face, she requested a voice lineup.

¶116     On July 17, 2008, Margie heard a voice lineup consisting of the separately recorded voices of five male police officers and Goudeau.  Each exemplar was recorded on a separate CD and consisted of the same few sentences looped.  Detective Femenia testified at trial that all the voices, including Goudeau's, were recorded in the same room with the same equipment.  The entire voice lineup was audio and video recorded.

¶117     Margie answered "No" when asked before the lineup whether she had heard Goudeau speak in court or on television. Detective Femenia told her that "the suspect's voice may or may not be in this group

of recordings." After listening to each recording once, Margie replayed exemplars 2, 3, and 4 again before identifying exemplar 4, which was Goudeau, as the voice of her assailant. Detective Femenia asked whether she identified the voice based on her recall from the day of the incident, and she responded "Yes." Throughout the playing of the tapes, Detective Femenia did not comment or display any reaction.

¶118 Before trial, Goudeau moved to preclude evidence of Margie's voice identification. The trial court denied the motion. Although the court noted that Goudeau's exemplar "sounds like it was done in a cave" and is "perceptively distinct from the other exemplars," it concluded that the procedure was not unduly suggestive and that Margie's identification was the product of her recall of the incident and not the differences in the recording.

¶119 The video of the voice identification was played at trial. Margie also testified that Goudeau's voice was "my nightmare for years" and that, although she could not remember what number she had originally selected in the voice lineup three years earlier, she "knew that was his voice" when she heard it played again at trial. Margie was subsequently cross-examined on details of her identification.

### d. Any P. (Chapter 5)

¶120 Any P. testified at trial that she spent approximately thirty to forty-five minutes with her assailant, whom she described as 5'11" tall, 170–180 pounds, and wearing a khaki fisherman hat with a long-haired wig and glasses without any lenses. She recalled having helped develop a composite sketch, which she rated as a nine out of ten in terms of accuracy of depiction, and acknowledged having previously identified a different individual from a photo array that did not include Goudeau. The parties stipulated that on September 7, 2006, Any failed to identify anyone in a photo array that included Goudeau and told police that she did not remember her assailant's appearance.

¶121 Any acknowledged having seen Goudeau's arrest on television and thinking "[t]hat was him," but at trial she was uncertain whether seeing Goudeau on television would affect her ability to identify

him in court that day. Outside the jury's presence, the court held a *Dessureault* hearing during which Any maintained that her identification was based on her memory of the assault. After considering the reliability factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), the trial court concluded that Any's identification was sufficiently reliable and denied Goudeau's motion to preclude. Any was extensively cross-examined on the details of her identification.

### e. Jesus L.

¶122        Before Jesus L.'s testimony, the State requested and the court granted a brief *Dessureault* hearing to determine the admissibility of identification testimony by him. At the hearing, Jesus identified Goudeau as the man who robbed him on November 7, 2005. Jesus acknowledged that before coming into court he was unsure whether he could identify the robber because he had not seen him since that date. But he testified that he identified Goudeau in court based on his memory of the robbery. He further testified that the restaurant where he worked was well lit and that he observed Goudeau from a foot away for a "[m]aximum of two minutes."

¶123        Considering Jesus's testimony in light of the *Biggers* factors, the trial court admitted his identification testimony. Jesus subsequently identified Goudeau at trial and was cross-examined on his identification.

### f. Cheryl M. (Chapter 6)

¶124        The trial court also conducted a *Dessureault* hearing during trial before Cheryl M.'s testimony. Cheryl identified Goudeau at the hearing as the man who attempted to rob her and her mother at gunpoint outside the restaurant where Jesus L. worked. She testified that the location of the encounter was "well lit," and that he was three feet away from her at one point, allowing her to clearly see his face. She described him as an African-American male, with a light goatee and dark eyes, wearing blue jeans and a fishing cap with a wig, and carrying a "metallic or gray colored" handgun.

¶125        Cheryl acknowledged having seen Goudeau's arrest and composite sketch on television, but maintained that she identified him based on her memory of the incident alone, rating her confidence level as a

nine out of ten, although she had earlier failed to identify anyone in a photo array that included Goudeau's photo.

¶126 The trial court allowed Cheryl's in-court identification. The court reasoned that any weakness in the identification "goes to weight and not admissibility." She identified Goudeau at trial and was subsequently cross-examined on her identification.

### g. Peter O. (Chapter 7)

¶127 On August 10, 2011, a *Dessureault* hearing was held during trial to determine the admissibility of identification testimony by Peter O. At the hearing, he testified that on the evening of December 12, 2005, he was getting ready to leave work when he heard noises coming from the alley behind his office building. When he went outside and looked, he saw Goudeau about ten feet away holding a chrome handgun pointed at a body on the ground. When Goudeau noticed Peter, he aimed his gun at him.

¶128 Peter reported looking at Goudeau for five to ten seconds before he turned and went back into his building. He described Goudeau as having "[a] very cold stare," noticeable eyebrows, a "protrud[ing]" forehead, and wearing a hooded sweatshirt and white sneakers. He testified that he saw Goudeau's composite sketch in the news and "immediately said that looks like him." He also admitted to having seen Goudeau's photograph on the internet. He was never shown a photographic lineup.

¶129 Peter testified that he identified Goudeau based on his memory of the night in question, stating that he could "never forget those eyes." The trial court concluded that "there was no police action vis-à-vis identification" and that, considering the *Biggers* factors, Peter's identification was sufficiently reliable and admissible. He identified Goudeau at trial and was subsequently cross-examined on his identification.

### 2. Discussion

¶130 The Fourteenth Amendment's Due Process Clause requires that pretrial identification procedures be conducted in a fundamentally fair

37

manner to ensure the suspect's right to a fair trial. *Lehr I*, 201 Ariz. at 520 ¶ 46, 38 P.3d at 1183. But "the due process clause does not preclude every identification that is arguably unreliable; it precludes identification testimony procured *by the state* through unduly suggestive pretrial procedures." *State v. Williams*, 166 Ariz. 132, 137, 800 P.2d 1240, 1245 (1987); *accord Perry v. New Hampshire*, 132 S. Ct. 716, 726 (2012) ("The due process check for reliability . . . comes into play only after the defendant establishes improper police conduct.").

¶131 To establish that admission of identification testimony violated due process, a defendant must first show that the state was responsible for the suggestive pretrial identification. *See Garcia*, 224 Ariz. at 8 ¶ 9, 226 P.3d at 377. Absent state action, the trial court need not analyze the reliability of an identification. *See id.* at ¶ 12; *State v. Prion*, 203 Ariz. 157, 160 ¶ 15, 52 P.3d 189, 192 (2002) ("There is no need to perform a *Biggers* analysis when the identification is not the result of state action."). In such circumstances, reliability is sufficiently tested "through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Perry*, 132 S. Ct. at 721.

¶132 When sufficient state action is established, a two-part test is used for determining the admissibility of identification testimony: "(1) whether the method or procedure used was unduly suggestive, and (2) even if unduly suggestive, whether it led to a substantial likelihood of misidentification, i.e., whether it was reliable." *Lehr I*, 201 Ariz. at 520 ¶ 46, 38 P.3d at 1183. We consider the totality of the circumstances in determining whether an identification is reliable, including (1) the witness's opportunity to view or hear the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty; and (5) the length of time between the crime and the confrontation. *See Biggers*, 409 U.S. at 199–200; *Lehr I*, 201 Ariz. at 521 ¶ 48, 38 P.3d at 1184; *see also State v. Rojo-Valenzuela*, 237 Ariz. 448, 449 ¶ 1, 451 ¶ 10, 352 P.3d 917, 918, 920 (2015).

¶133 "[A]n in-court identification resulting from inherently

suggestive initial identification is admissible unless the procedure created a 'very substantial likelihood of . . . misidentification.'" *Rojo-Valenzuela*, 237 Ariz. at 450 ¶ 7, 352 P.3d at 919 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)). "Short of that point, such [identification] evidence is for the jury to weigh. . . . Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Brathwaite*, 432 U.S. at 116.

¶134 Here, the State was not responsible for the pretrial identifications by Jenny S., Lorena L., Alejandra L.,[8] Any P., Cheryl M., Peter O., or Jesus L. Although each acknowledged having previously seen Goudeau's photograph, arrest video, and/or composite sketch in the media, Goudeau does not claim that the media acted as an agent of the state. *Cf. Garcia*, 224 Ariz. at 8 ¶ 11, 226 P.3d at 377 (finding no state action where an unidentified third party used police-released photos to create and distribute a flier); *Prion*, 203 Ariz. at 160 ¶ 15, 52 P.3d at 192 (same, where article that accompanied defendant's photograph was written by a freelance writer who "had some contact with," but was not employed by, the police).

¶135 To be sure, Phoenix police released some information about the suspect to the media. But after Goudeau's arrest, the defense team also released information to the media. Moreover, the State took measures to limit media influence by contacting the victims to show them a photo array before Goudeau's arrest and asking the media to delay broadcasting news of the arrest until the police had an opportunity to do so. In sum, although police disseminated Goudeau's composite sketch and photo to the media, there is no evidence that police attempted to influence any of these witnesses' pretrial identifications, for example, by arranging for or

---

[8] The State argues that Goudeau is collaterally estopped from challenging the sisters' identifications because the issue was previously litigated and decided in the prior trial and then affirmed on appeal. *See Goudeau*, 1 CA-CR 07-1069, at *4–5 ¶¶ 22–31. But "[c]ollateral estoppel in criminal cases is not favored and is applied sparingly." *State v. Rodriguez*, 198 Ariz. 139, 141 ¶ 6, 7 P.3d 148, 150 (App. 2000). Accordingly, we address the merits of Goudeau's challenge regarding the sisters' identifications.

encouraging victims to view the media coverage. *Cf. State v. Nordstrom* (*Nordstrom I*), 200 Ariz. 229, 241 ¶ 24, 25 P.3d 717, 729 (2001) (finding no state action where a witness observed the defendant in a newscast of his arraignment); *O'Connell v. Indiana*, 742 N.E.2d 943, 948 (Ind. 2001) ("A witness' viewing of a suspect's photograph through the media does not ordinarily constitute an impermissibly suggestive identification procedure because it is not engineered by prosecution or law enforcement agencies."). Consequently, even if the media coverage played a role in the victims' identifications of Goudeau—an issue disputed by the State and the victims—the State was not sufficiently responsible for the coverage to require a reliability determination.

¶136 Goudeau argues that the in-court identifications by Jenny S., Jesus L., Cheryl M., and Peter O. were in essence one-person showups because these victims had not previously identified Goudeau in a photo array or otherwise. With respect to Jenny S., who identified Goudeau as her assailant after seeing him at a preliminary hearing, our decision in *State v. Forde*, 233 Ariz. 543, 315 P.3d 1200 (2014), is controlling. There, we held that the trial court was not required to conduct a *Dessureault* hearing because "[n]othing suggests that the State asked [the victim] to attend the [pretrial] hearing to see [the defendant]." *Forde*, 233 Ariz. at 556–57 ¶ 30-31, 315 P.3d at 1213–14 (citing *Perry*, 132 S. Ct. at 730, and *Williams*, 166 Ariz. at 137, 800 P.2d at 1245, for the proposition that "only state action requires a *Dessureault*-type hearing"). Although Goudeau correctly points out that the witness in *Forde* regularly attended hearings on her own before identifying the defendant, *id.* at 556 ¶ 31, 315 P.3d at 1213, his contentions that Jenny S. attended the hearings "at the request of victim witness advocates," and that Goudeau "was the only non-lawyer African American male in jail garb and shackles . . . [who] she was shown that day," are without support in the record. Jenny S. reported that Goudeau was wearing a long sleeve button-up shirt and tie when she identified him at the hearing. Moreover, the trial court found that Jenny's presence in court "was as a result of [her] Arizona Constitutional right to be present and not the voluntary initiation of the State," and the record supports that finding. Accordingly, under *Forde*, the trial court did not err in admitting Jenny S.'s in-court identification.

¶137 Nor did the court err in allowing Jesus L., Cheryl M., and Peter O. to identify Goudeau in court. Each identified Goudeau for the first

time during regular court proceedings in which they were called as witnesses. Goudeau argues that these identifications were conducted under unduly suggestive circumstances because he was the only African-American male in the courtroom and was seated beside his two defense lawyers.

¶138 The court of appeals has upheld the admission of eyewitness identification testimony under similar circumstances in *State v. Nottingham*, 231 Ariz. 21, 289 P.3d 949 (App. 2012). Before the second trial in that case (the first trial having ended in a mistrial), the defendant unsuccessfully moved to suppress any in-court identifications by the witnesses who had identified him for the first time in the previous trial. *Id.* at 23 ¶¶ 2–3, 289 P.3d at 951. The defendant argued on appeal that "there is no meaningful analytical distinction between suggestive procedures conducted by police officers in advance of court proceedings and those conducted by prosecutors during court proceedings in advance of trial." *Id.* at 24 ¶ 7, 289 P.3d at 952.

¶139 Relying on *Perry*, the court of appeals disagreed. *See id.* at 25 ¶¶ 9–10, 289 P.3d at 953. *Perry* held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." 132 S. Ct. at 730. The Supreme Court observed that "[a] primary aim of excluding evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place," and that this "deterrence rationale" does not apply when "the police [have] engaged in no improper conduct." *Id.* at 726. The Court reasoned, "[w]hen no improper law enforcement activity is involved . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose," such as "vigorous cross-examination" at trial. *Id.* at 721.

¶140 In *Nottingham*, the court of appeals acknowledged this Court's holding in *State v. Strickland*, 113 Ariz. 445, 447, 556 P.2d 320, 322 (1976), "that suggestive identification procedures occurring as part of formal court proceedings, like those arranged by police, may trigger the procedural protections set forth in *Dessureault*." *Nottingham*, 231 Ariz. at 25 ¶ 8, 289

P.3d at 953. But the court concluded, and we agree, that "*Strickland* has been overtaken by *Perry* to the extent [*Strickland*] found that subsequent in-court identifications could be precluded based on suggestive in-court identification procedures that did not involve improper state conduct." *Id.* at 25 ¶ 10, 289 P.3d at 953 (internal quotation marks and citation omitted).

¶141 *Perry* controls here. Because the identifications by Jesus L., Cheryl M., and Peter O. occurred as part of formal court proceedings and were not influenced by improper law enforcement activity, the trial court did not abuse its discretion in allowing their in-court identifications.

¶142 Regarding Margie M.'s voice identification, Goudeau asserts that the trial court abused its discretion by not finding the voice exemplars unduly suggestive. Having reviewed the recordings, we disagree. Although Goudeau's exemplar had an echo and the others did not, the differences in sound quality between the exemplars was not so great as to render the procedure impermissibly suggestive. Detective Femenia advised Margie before playing the tapes that the recordings might vary in volume, sound quality, and noise, and in fact the audio quality did vary among all exemplars. Margie listened attentively to the exemplars several times before making an identification, and Detective Femenia projected no cue or clues throughout the playing of the tapes.

¶143 Margie had ample opportunity to hear her assailant's voice throughout the encounter, which lasted a half hour and during which time he spoke continuously directly behind her ear. Moreover, she testified that her assailant's voice was "all I kept hearing," and "my nightmare for years." The trial court did not abuse its discretion in admitting evidence of Margie's voice identification.

## H. Admission of Firearms Expert Testimony

¶144 Goudeau contends that the trial court erred by admitting the expert testimony of Daniel Hamilton, a firearms examiner with the PPD crime laboratory. At trial, Hamilton opined that every bullet and casing retrieved in this case was fired from the same firearm. We review the trial court's admission of expert testimony for abuse of discretion, *State v. Snelling*, 225 Ariz. 182, 187 ¶ 18, 236 P.3d 409, 414 (2010), but review for

fundamental error any arguments raised for the first time on appeal.

**¶145** Before trial, Goudeau moved to preclude Hamilton from testifying on the ground that his opinions did not satisfy the standard set in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The trial court denied the motion, ruling that the testimony was admissible under the standard established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The court did not err because *Frye* rather than *Daubert* applied in Goudeau's 2011 trial. *See State v. Miller*, 234 Ariz. 31, 41 ¶ 29, 316 P.3d 1219, 1229 (2013) (holding that the *Frye*, not *Daubert*, standard applied to defendant's trial, which ended before Arizona's amended Evidence Rule 702 took effect in January 2012); *Brown v. Watters*, 599 F.3d 602, 616 (7th Cir. 2010) (noting the absence of "authority in which the *Daubert* standard has been imposed on states as a requirement of due process in any context, including criminal trials").

**¶146** Nor did the trial court err by declining to hold a *Frye* hearing before ruling on the admissibility of Hamilton's testimony. *See State ex rel. Romley v. Fields*, 201 Ariz. 321, 325 ¶ 11, 35 P.3d 82, 86 (App. 2001) (noting that a *Frye* hearing is only required before admitting expert testimony that relies on new scientific tests or techniques). Because this testimony was not a "new" form of expert testimony and Arizona courts had previously upheld its admissibility, a *Frye* hearing was not required. *See Miller*, 234 Ariz. at 41 ¶ 31, 316 P.3d at 1229 (holding that firearm expert testimony was admissible under *Frye*).

**¶147** Goudeau next argues that the trial court violated his due process rights by admitting Hamilton's testimony without limitation. But because Goudeau did not request any limiting instruction or object to the lack of one, his argument fails. *See State v. Taylor*, 127 Ariz. 527, 530–31, 622 P.2d 474, 477–78 (1980) (stating that to preserve a claim of error in not limiting certain evidence, party must request appropriate instructions); *see also* Ariz. R. Crim. P. 21.2 (requiring parties to request jury instructions). Goudeau cites a few federal district court cases in which ballistics experts, using toolmark evidence, were not allowed to express their opinions identifying firearms with absolute scientific certainty. Other courts, however, have required no such limitation, and Goudeau cites no case in which an appellate court found fundamental error in a trial court's failing

to sua sponte limit such testimony. In addition, Hamilton acknowledged on cross-examination that his firearms-identification opinion in this case was "subjective" and based on his training and experience, not a "statistical formula."

¶148 Goudeau also argues that the trial court fundamentally erred by admitting Hamilton's testimony that, as part of a "second chair[] process," another unidentified PPD firearms examiner "agree[d] with [Hamilton's] identification" after comparing the bullets Hamilton inspected. That testimony, Goudeau contends, was hearsay and violated the Confrontation Clause. Goudeau did not argue this in the trial court so we review only for fundamental error. Even if we assume, without deciding, that Hamilton's brief testimony about a second-chair process constituted testimonial hearsay, its admission did not rise to the level of fundamental error.

¶149 Further, Hamilton did not act as a mere "conduit" for the second chair's opinion. *See Snelling*, 225 Ariz. at 187 ¶ 19, 236 P.3d at 414 ("The expert . . . cannot 'act as a conduit for another non-testifying expert's opinion.'" (quoting *State v. Smith*, 215 Ariz. 221, 228 ¶ 23, 159 P.3d 531, 538 (2007)). Rather, Hamilton presented his expert opinions based on his own work and analysis of the available ballistics evidence. Moreover, the State's line of questioning was not directed at eliciting whether the second chair agreed with Hamilton's opinion *in this case*, but rather what type of verification processes the PPD crime laboratory generally followed in cases "such as" this. Goudeau has not established that the unopposed admission of this portion of Hamilton's testimony constituted fundamental error.

## I. Admission of Autopsy Photograph (Chapter 7)

¶150 Goudeau contends that the trial court violated his right to due process by admitting a particular autopsy photograph into evidence in Chapter 7. We review a trial court's admission of photographs for abuse of discretion. *Cota*, 229 Ariz. at 147 ¶ 45, 272 P.3d at 1038.

¶151 After Peter O. concluded his testimony that he saw Goudeau standing over a body (later identified as Tina Washington) with a gun pointed at her head, Goudeau objected to the State's proffer of a photograph

intended for use in the medical examiner's ensuing testimony. The color photograph at issue depicted the front of Washington's body lying on an autopsy table, with a metal trajectory rod, depicting a bullet's path of travel, inserted through her left hand, through her neck, and finally into the top part of her right shoulder. A second gunshot wound is visible on her left cheek. All wounds have been cleaned off, though some blood is still visible on her face and shoulder. Goudeau objected to introduction of the photograph on grounds that its graphic nature was prejudicial, that the State could explain the gunshot trajectory without it, and that the manner and cause of Washington's death were undisputed.

¶152 The trial court overruled Goudeau's objection and allowed the State to admit the photograph during the medical examiner's testimony "for purposes of showing the direction of the shot" and "the possible position of [the] shooter." Reasoning that the photograph was relevant to the extent it corroborated Peter's testimony about seeing Goudeau standing over Washington's body, the trial court found that the risk of unfair prejudice did not substantially outweigh the photograph's probative value.

¶153 "Whether the trial court abused its discretion in admitting a photograph turns on (1) the photograph's relevance, (2) its tendency to inflame the jury, and (3) its probative value compared to its potential to cause unfair prejudice." *Cota*, 229 Ariz. at 147 ¶ 46, 272 P.3d at 1038. When a relevant photograph is inflammatory, however, the court should not admit it without first determining whether the danger of unfair prejudice substantially outweighs the photograph's probative value. *State v. Bocharski*, 200 Ariz. 50, 56 ¶ 21, 22 P.3d 43, 49 (2001).

¶154 The autopsy photograph in question was relevant because "the fact and cause of death are always relevant in a murder prosecution." *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983), *superseded on other grounds by* A.R.S. § 13-756. This is so even when those facts are not contested because "the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." *Estelle v. McGuire*, 502 U.S. 62, 69 (1991); *cf. State v. Rienhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997) ("Notwithstanding an offer to stipulate to the cause of death, photographs of a murder victim are relevant if they help to illustrate what occurred.").

¶155    Moreover, the photograph assisted and corroborated the medical examiner's explanation of Washington's injuries.  Though the medical examiner's explanations were not disputed, the photograph in conjunction with his testimony corroborated Peter's account of the events and helped establish an approximate distance between him and the shooter.  Because Peter's identification of Goudeau was contested, the photograph was probative on the key issue of the perpetrator's identity.

¶156    Though the color photograph was graphic, it did not rise to the level of gruesomeness we have found "unduly disturbing" in past cases.  *Cf. State v. Spreitz*, 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997) (finding abuse of discretion in admission of autopsy photographs showing decomposition and insect activity on the body).  This case is distinguishable from *Bocharski*, where we found that the trial court erred by admitting two photographs depicting "views of the victim's skull, the top and its contents having been removed, with a metal rod going through an opening to the inside."  200 Ariz. at 55 ¶ 20, 56 ¶¶ 26–27, 22 P.3d at 48–49.  There, the trial court admitted the photographs to show the angles of the wounds, yet "the prosecutor did not elicit testimony concerning these angles or their significance," and "there was no testimony at trial rendering [the photographs] particularly meaningful."  *Id.* at 56 ¶ 26, 22 P.3d at 49.  In this case, however, the State elicited significant testimony relating to the purposes for which the trial court admitted the photographs, namely the direction of the shot and the possible position of the shooter.

¶157    Goudeau contends that the State could have used other evidence to explain what the photograph depicted and that this photo was cumulative because the State also introduced several other photographs.  But whether "the subject-matter of a photograph can be described with words" "is not the test of admissibility."  *State v. Castaneda*, 150 Ariz. 382, 391, 724 P.2d 1, 10 (1986).  Rather, the test is whether the probative value of a relevant, yet gruesome photograph is substantially outweighed by its danger to cause unfair prejudice.  *Bocharski*, 200 Ariz. at 55 ¶ 21, 22 P.3d at 48.  Because the perpetrator's identity was the key issue at trial, the trial court did not abuse its discretion in finding that the photograph's probative value was not substantially outweighed by its potential to inflame the jury.

¶158    Finally, the photograph was not needlessly cumulative

because it was the only one that illustrated the position of the shooter, which in turn corroborated Peter's identification of Goudeau. Therefore, the trial court acted within its discretion by admitting the photograph.

## J. Preclusion of Third-Party Culpability Defense (Chapter 10)

¶159 Goudeau argues that the trial court violated his right to present a complete defense by precluding reliable third-party culpability evidence in Chapter 10. We review the court's ruling for abuse of discretion. *Prion*, 203 Ariz. at 161 ¶ 21, 52 P.3d at 193.

¶160 During testimony from Jeremy Robinson, victim Kristin Gibbons's boyfriend, defense counsel inquired about Gibbons's injuries before her murder. (Gibbons reportedly told her mother that "she was mugged," but she had no bruises or injuries.) The State objected that such evidence was not timely disclosed, was speculative, and was hearsay to the extent it relied on what Gibbons had told her mother.

¶161 Outside the jury's presence, Robinson testified that he did not recall Gibbons telling him or anyone else that she had been mugged just before the murder, nor did he recall her having any bruising on the night of the murder. Because Robinson lacked firsthand knowledge of any prior assault, the court precluded any evidence from him on the issue.

¶162 The next day, the State moved to preclude defense counsel from cross-examining Detective Rosenthal about conversations Gibbons allegedly had with her mother and a friend a few days before her disappearance, indicating that she had been mugged and beaten up by two Hispanic males and suffered injuries to her face and tooth. The trial court excluded the evidence "on hearsay, late disclosure, [Rule] 402 and 403" grounds.

¶163 Rules 401 through 403 of the Arizona Rules of Evidence govern the admission of third-party culpability evidence. *State v. Machado*, 226 Ariz. 281, 284 ¶ 16, 246 P.3d 632, 635 (2011). Under those rules, the proffered evidence must first be relevant; that is, it must "*tend* to create a reasonable doubt as to the defendant's guilt," *State v. Gibson*, 202 Ariz. 321, 324 ¶ 16, 44 P.3d 1001, 1004 (2002). If the evidence is relevant, it is admissible unless it is otherwise precluded by the federal or state

constitution, or by applicable statutes or rules. Ariz. R. Evid. 402. As with any relevant evidence, the trial court has discretion to exclude third-party culpability evidence if its probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Ariz. R. Evid. 403.

¶164    Here, the trial court could reasonably have found that the proffered third-party culpability evidence did not create a reasonable doubt as to Goudeau's guilt and was inadmissible on several grounds. There were no suspects and no suggestion that the alleged assault had any connection to Gibbons's murder.

¶165    Goudeau suggests that the proffered evidence established that two other men had motive and opportunity to kill Gibbons. We disagree. "[A] defendant may not, in the guise of a third-party culpability defense, simply throw strands of speculation on the wall and see if any of them will stick." *Machado*, 226 Ariz. at 284 ¶ 16 n.2, 246 P.3d at 635 n.2 (internal quotation marks and citation omitted); *accord Prion*, 203 Ariz. at 161 ¶ 21, 52 P.3d at 193 (noting the trial court's discretion to exclude such evidence if it offers "only a possible ground of suspicion against another").

¶166    Unlike *Machado* and *Prion*, where considerable evidence suggested that a third party committed the crimes for which the defendant was charged, there is simply no evidence connecting the two Hispanic males involved in the alleged assault to Gibbons's murder. *Cf. Machado*, 226 Ariz. at 285 ¶ 24, 246 P.3d at 636 (holding that the trial court improperly excluded evidence of anonymous phone call in which the caller admitted committing the crime and there were "powerful indications" that the third party, not the defendant, was the caller); *Prion*, 203 Ariz. at 161–62 ¶ 25, 52 P.3d at 193–94 (finding evidence relevant that showed that the third party had the opportunity and motive to commit the crime and may have been in contact with the victim). Any suggestion that an unidentified Hispanic male murdered Gibbons is pure speculation.

¶167    In addition, as the trial court determined, Goudeau's third-party culpability claim rested on inadmissible hearsay, Arizona Rules of Evidence 801(c) and 802, was untimely disclosed for the first time forty-four

days into trial (after Gibbons's mother and the medical examiner had already testified), Arizona Rule of Criminal Procedure 15.1(b)–(c), and "failed the [Evidence] Rule 403 balancing test." *State v. Dann*, 205 Ariz. 557, 569 ¶ 35, 74 P.3d 231, 243 (2003). The court did not abuse its discretion in precluding the evidence on each of those grounds.

### K. Substantial Evidence of Guilt

**¶168** At the close of the State's case-in-chief, Goudeau moved for judgment of acquittal under Arizona Rule of Criminal Procedure 20 on all seventy-four counts on which he was indicted. The trial court issued detailed findings denying the motion as to all but two of the counts. Goudeau contends that the trial court abused its discretion by denying his Rule 20 motion on seventeen of the remaining counts, arguing that the State failed to present sufficient evidence to support a finding of guilt. We review de novo the denial of a Rule 20 motion. *State v. West*, 226 Ariz. 559, 562 ¶ 15, 250 P.3d 1188, 1191 (2011).

**¶169** Acquittal is required "if there is no substantial evidence to warrant a conviction." Ariz. R. Crim. P. 20(a). Substantial evidence "is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *West*, 226 Ariz. at 562 ¶ 16, 250 P.3d at 1191 (internal quotation marks and citations omitted). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citations omitted). In determining whether substantial evidence supports a conviction, we consider both direct and circumstantial evidence, *id.*, and resolve all inferences against the defendant, *State v. Davolt*, 207 Ariz. 191, 212 ¶ 87, 84 P.3d 456, 477 (2004).

#### 1. Counts 19–27 (Chapter 4)

**¶170** Counts 19–27 charged Goudeau with kidnapping, armed robbery, sexual assault, sexual abuse, and child molestation against Margie M. and her daughter, Bianca. *See supra* ¶¶ 13–14. Although Bianca identified a different individual from a photo array that did not include

Goudeau, Margie later identified Goudeau's voice from a series of voice exemplars based on her recollection of the incident. In addition, the *modus operandi* of the perpetrator of counts 19–27 closely matched Goudeau's in other chapters, including threatening Margie and Bianca with a gun while ordering Margie to drive up and down particular streets, making statements regarding a recent robbery and being separated from a friend, wearing a fisherman's hat and long-haired wig disguise, and wiping off the victims where he had touched them.

¶171        Further, the offenses against Margie and Bianca took place only moments after Goudeau, wearing the same disguise, robbed the restaurant at which Iselda H. worked, and she positively identified Goudeau during a photo lineup conducted in September 2006. This evidence was sufficient to allow the jury to determine that Goudeau was the perpetrator in counts 19–27. *See Stuard*, 176 Ariz. at 597, 863 P.2d at 899 (evidence of other acts is admissible under Rule 404(b) to prove the identity of the perpetrator of the instant crimes, provided that identity is at issue and the "pattern and characteristics of the crimes [are] so unusual and distinctive as to be like a signature").

### 2. Count 28 (Chapter 5)

¶172        Count 28 charged Goudeau with armed robbery of Teresa G. *See supra* ¶¶ 15–16. About a month after the robbery, Teresa selected another individual from a photo array that did not include Goudeau's photo, but before then she helped create a sketch of the robber. That sketch was very similar to the one Any P. (Chapter 5) helped create. Additionally, moments after the robbery, Goudeau approached Any in the parking lot across from the store where Teresa worked, wearing the same fisherman's hat and long-haired wig as the perpetrator of the robbery involving Teresa as well as the crimes against Margie M. and Bianca M. Goudeau's Y-STR DNA profile was found on Any and the *modus operandi* of the perpetrator of the crimes against her closely matched Goudeau's in other chapters. This evidence was sufficient to permit a rational trier of fact to find Goudeau guilty on count 28.

### 3. Count 40 (Chapter 6)

¶173        Count 40 charged Goudeau with aggravated assault against Mauricio O. *See supra* ¶¶ 17–18. "A person commits aggravated assault if the person commits assault as prescribed by § 13-1203 . . . [and] uses a deadly weapon or dangerous instrument." A.R.S. § 13-1204(A)(2). "A person commits assault by . . . [i]ntentionally placing another person in reasonable apprehension of imminent physical injury." A.R.S. § 13-1203(A)(2).

¶174        Although Mauricio did not testify, the State presented sufficient circumstantial evidence that, by robbing him at gunpoint inside a restaurant, Goudeau placed him in apprehension of imminent physical injury. After Goudeau left the restaurant, Mauricio and Pedro M. chased him. Pedro testified that they heard a gunshot and "got scared" so they stopped chasing Goudeau. A jury could reasonably find that Mauricio's reaction was based on his apprehension of imminent physical harm. *Cf. State v. Wood*, 180 Ariz. 53, 66, 881 P.2d 1158, 1171 (1994) (concluding the jury could have found that police officers, who did not testify, acted with apprehension or fear when they reacted to defendant's brandishing of a revolver by firing at him).

### 4. Count 46 (Chapter 6)

¶175        Count 46 charged Goudeau with attempted armed robbery against Cheryl M. *See supra* ¶¶ 17–18. A person is guilty of armed robbery if, while taking another's property from her person or immediate presence against her will, the person threatens or uses a deadly weapon "against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property." A.R.S. §§ 13-1902(A), -1904(A)(2). A person is guilty of attempted armed robbery if he does "anything which . . . is any step on a course of conduct planned to culminate in commission of" armed robbery. A.R.S. § 13-1001(A)(2).

¶176        Cheryl testified that Goudeau pulled out a gun and demanded that her mother turn over her purse to him. Her mother froze and Goudeau repeatedly said, "'give me your . . . purse . . . or I am going to shoot you.'" She also testified that "[h]e held out a gun and said, give me your money," followed twice by stating, "give me your . . . money." At trial, Cheryl identified Goudeau as the perpetrator. This evidence was

51

sufficient to allow the jury to decide that Goudeau committed attempted armed robbery against Cheryl and her mother.

¶177    Goudeau argues, "[s]ince there was no testimony that a gun was pointed at [Cheryl] or any demand or conduct towards her that sought to coerce surrender of her property this conviction must be vacated."  We disagree.  *See State v. McGuire*, 131 Ariz. 93, 96, 638 P.2d 1339, 1342 (1981) ("A.R.S. § 13-1902 requires only that force be used 'against any person,' not necessarily only against the person dispossessed of the property.").

### 5.  Counts 67–71 (Chapter 12)

¶178    Counts 67–71 charged Goudeau with kidnapping, attempted sexual assault, and attempted first-degree murder against Adrienne M.  *See supra* ¶ 24.  Adrienne testified that a man approached her as she got in her car, pointed a silver handgun at her temple, and demanded that she let him in.  The man told her that

> his friend had robbed a grocery store with him and that he needed to get away to go get the money, that [she] was going to be the person who was going to drive him to get the money . . . to get to . . . [his] boy who has [his] money.

He ordered Adrienne to drive on particular streets and eventually to pull over in a secluded residential neighborhood where he threatened her life unless she complied with his demands to perform certain sexual acts.

¶179    Adrienne's description of her perpetrator's *modus operandi* closely matches that of Goudeau's other victims and was sufficient to allow the jury to determine that Goudeau committed the offenses charged in counts 67–71.  Although Adrienne never identified Goudeau and no physical evidence tied him to the offenses, her testimony and reasonable inferences from it provided sufficient evidence that Goudeau committed the charged crimes.

### L.  Evidence of Especially Cruel Murders

¶180    Goudeau contends that the State did not present sufficient evidence to support the jury's findings that he committed eight of the nine

murders in an especially cruel manner.

**¶181** Pursuant to A.R.S. § 13-756(A), we review the jury's finding that a murder was especially cruel for abuse of discretion, *State v. Morris*, 215 Ariz. 324, 340 ¶ 72, 160 P.3d 203, 219 (2007), viewing the facts in the light most favorable to sustaining the verdict, *State v. Naranjo*, 234 Ariz. 233, 249 ¶ 81, 321 P.3d 398, 414 (2014), and resolving all inferences against the defendant, *Davolt*, 207 Ariz. at 212 ¶ 87, 84 P.3d at 477. "A finding of aggravating circumstances is not an abuse of discretion if there is any reasonable evidence in the record to sustain it." *Naranjo*, 234 Ariz. at 249 ¶ 81, 321 P.3d at 414 (internal quotation marks and citation omitted). Conversely, a jury abuses its discretion if it finds an aggravating circumstance when the record reflects insufficient evidence to support that finding beyond a reasonable doubt. *See State v. Gunches*, 225 Ariz. 22, 25 ¶ 14, 26 ¶¶ 18–23, 234 P.3d 590, 593, 594 (2010).

**¶182** Goudeau argues that we must review de novo whether the State has proved an aggravating circumstance. We previously rejected this argument in *State v. (Cody J.) Martinez*, 218 Ariz. 421, 434 ¶¶ 61–62, 189 P.3d 348, 361 (2008), and declined to reconsider that decision in *Cota*, 229 Ariz. at 153 ¶ 92, 272 P.3d at 1044 (citing *(Cody J.) Martinez* in observing "we have already determined that abuse of discretion review is constitutional"), and *Hausner*, 230 Ariz. at 80 ¶¶ 83–84, 280 P.3d at 624 ("We decline to reconsider [*(Cody J.)*] *Martinez*."). We likewise decline to reconsider the standard of review issue here.

**¶183** To clarify, this Court does not assess de novo whether the aggravating circumstances existed, as we previously did under independent review. *See Martinez*, 218 Ariz. at 434 ¶ 60, 189 P.3d at 361 ("In 2002, the legislature ended our independent review of death penalty verdicts for murders committed after August 1, 2002."). But we do assess de novo whether there was sufficient evidence from which any reasonable juror could find the aggravator. Absent such evidence, a jury would "abuse its discretion" by finding the aggravator.

**¶184** "[A] murder is especially cruel only if the State proves beyond a reasonable doubt that 'the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known

that suffering would occur.'" *Snelling*, 225 Ariz. at 188 ¶ 25, 236 P.3d at 415 (quoting *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997)). The victim need not have been conscious for every wound inflicted, *State v. Sansing*, 206 Ariz. 232, 235 ¶ 7, 77 P.3d 30, 33 (2003), nor must the victim's suffering have lasted for any specific length of time, *State v. Cropper*, 223 Ariz. 522, 526 ¶ 13, 225 P.3d 579, 583 (2010). "Mental anguish includes the victim's uncertainty as to her ultimate fate," *State v. Lavers*, 168 Ariz. 376, 392, 814 P.2d 333, 349 (1991), and evidence of a victim's pleas or defensive injuries may be sufficient to show that she suffered mental pain, *Snelling*, 225 Ariz. at 188 ¶ 27, 236 P.3d at 415. We consider the entire murder transaction, not merely the fatal act, in evaluating whether a murder was committed in an especially cruel manner. *State v. McCray*, 218 Ariz. 252, 259 ¶ 31, 183 P.3d 503, 510 (2008).

¶185 The jury found that Goudeau murdered each of the following victims in an especially cruel manner: Georgia Thompson, Tina Washington, Romelia Vargas, Mirna Roman, Chao Chou, Liliana Sanchez, Sophia Nunez, and Carmen Miranda. We conclude that the jury did not abuse its discretion inasmuch as the record sufficiently supports its findings.

### 1. Georgia Thompson (Chapter 2)

¶186 Testimony established that more than fifteen seconds before Goudeau shot Thompson in the head, she begged to be let go and screamed. Thompson was found with her pants unzipped and unbuttoned, though her belt was still buckled. This evidence was sufficient to support a finding that Thompson experienced mental anguish before her death and that Goudeau knew or should have known that suffering would occur. *Cf. State v. Gomez* (*Gomez II*), 231 Ariz. 219, 226 ¶ 36, 293 P.3d 495, 502 (2012) (concluding that victim's screams, in addition to defensive wounds, supported a finding that murder was especially cruel).

### 2. Tina Washington (Chapter 7)

¶187 Washington was found dead in an isolated alley that was not on the route to her regular bus stop. The evidence showed that she had been shot twice; the first shot was not fatal and Washington raised her hand

in front of her face as if to shield against a second shot. The second and fatal shot was fired from close range. Like Thompson, Washington screamed before she died. This evidence was sufficient to support a finding that Washington experienced both physical and mental pain before her death and that Goudeau knew or should have known that suffering would occur. *Cf. Gomez II*, 231 Ariz. at 226 ¶ 36, 293 P.3d at 502; *Newell*, 212 Ariz. at 406 ¶ 85, 132 P.3d at 850 (non-fatal injuries occurring as part of murder transaction supported finding of serious physical anguish); *Sansing*, 206 Ariz. at 236 ¶ 10, 77 P.3d at 34 (defensive wounds support finding of mental anguish).

### 3. Romelia Vargas and Mirna Roman (Chapter 8)

¶188　　　Vargas and Roman were discovered dead in the back of their food truck with a gunshot wound to each of their heads. Their pants were unbuttoned and partially pulled down. It appeared that Roman had been shot before Vargas because a shell casing was found under Vargas's body and Vargas's leg was resting on top of Roman's leg. The jury could reasonably infer that they disrobed under threat of being shot, rather than being shot by surprise while disrobing, and that Vargas then witnessed Goudeau shoot Roman before he pointed the gun at her. This evidence was sufficient to support a finding that both Roman and Vargas experienced severe mental anguish before their death and that Goudeau knew or should have known that suffering would occur.

### 4. Chao Chou and Liliana Sanchez (Chapter 9)

¶189　　　The evidence showed that Chou and Sanchez left the restaurant where they worked in Chou's car. Their coworker always saw Chou turn his car and drive past the restaurant as he was leaving, but on the evening in question the coworker did not see Chou's car make that turn. Chou was later found dead in an alley with a gunshot wound to his head. Sanchez was found dead in the front passenger seat of Chou's car, about one mile from the alley, with a gunshot wound to her head and her pants unbuttoned and partially unzipped. The evidence further showed that both Chou and Sanchez were shot by someone seated in the back seat. From this evidence, the jury could have reasonably inferred that Goudeau, positioned in the back seat, held the victims at gunpoint while he forced Chou to drive,

and that both victims suffered severe mental anguish during the car ride. Further, the jury could find that Sanchez suffered significant uncertainty as to her ultimate fate after Goudeau shot Chou and continued the ride for another mile before also shooting her.

### 5. Sophia Nunez (Chapter 11)

¶190        Nunez was found dead in her bathtub with a gunshot wound to her head.  She had a few bruises, her bra was undone and shirt pulled up exposing her breasts, and she was still wearing pants.  Her eyes were open when she was shot from the front at close range.  The jury could have reasonably inferred that she was conscious while Goudeau threatened her at gunpoint and that she suffered significant mental anguish before he took her life.  The evidence was sufficient to support a finding that Goudeau murdered her in an especially cruel manner.

### 6. Carmen Miranda (Chapter 13)

¶191        The evidence showed that Miranda screamed and struggled as Goudeau ambushed her at a carwash and forced her into the backseat of her car.  She was later found dead in a nearby parking lot with a gunshot wound to her head.  Her eyes were open when Goudeau shot her; her pants were pulled down; she had recent abrasions on her right shoulder, left upper arm, and inside lower lip; and she had small bruises on her wrists and numerous bruises on her legs consistent with a struggle to keep her pants on.  This evidence was sufficient to support a finding that Miranda was murdered in an especially cruel manner.  *Cf. Gomez II*, 231 Ariz. at 226 ¶ 36, 293 P.3d at 502; *Newell*, 212 Ariz. at 406 ¶ 85, 132 P.3d at 850; *Sansing*, 206 Ariz. at 236 ¶ 10, 77 P.3d at 34.

## M. Prosecutorial Misconduct Claims

¶192        Goudeau asserts that the State repeatedly made inaccurate statements of law and improper arguments throughout the guilt and sentencing proceedings, amounting to fundamental error in violation of the Fourteenth Amendment.    We  evaluate  each  instance  of  alleged prosecutorial misconduct to determine if error occurred and, if so, its effect. *State v. Roque*, 213 Ariz. 193, 228 ¶ 154, 141 P.3d 368, 403 (2006).  We also address the cumulative effect of any misconduct.  *Morris*, 215 Ariz. at 335

¶ 47, 160 P.3d at 214. Because Goudeau did not object to any of the incidents at trial, we review for fundamental error. *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

**¶193** "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v.* (*Alex V.*) *Hughes*, 193 Ariz. 72, 79 ¶ 26, 969 P.2d 1184, 1191 (1998) (internal quotation marks and citation omitted). A conviction will be reversed for prosecutorial misconduct only if "(1) the prosecutor committed misconduct and (2) a reasonable likelihood exists that the prosecutor's misconduct could have affected the verdict." *State v. Benson*, 232 Ariz. 452, 463 ¶ 40, 307 P.3d 19, 30 (2013). The defendant's burden is to prove the misconduct was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *Morris*, 215 Ariz. at 335 ¶ 46, 160 P.3d at 214.

### 1. Statements likening Goudeau to a "wolf" and his disguises as "sheep's clothing"

**¶194** Throughout eleven of the State's thirteen opening statements and in closing argument, the prosecutor referred, without objection, to Goudeau as a "predator" or "wolf," and his various disguises as "sheep's clothing." Additionally, during opening statements for Chapters 1, 3, 7, 8, and 10, the prosecutor stated that Goudeau had been "hunting" or "on the prowl." Goudeau did not object to these comments at trial but argues on appeal that they "are clearly improper as they are designed to dehumanize the defendant and appeal to the passions and prejudices of the jury."

**¶195** The prosecutor's comments during opening statement likening Goudeau to a "wolf" and a "wolf in sheep's clothing" were improper. "Opening statement is counsel's opportunity to tell the jury what evidence they intend to introduce. . . . [It] is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted." *Bible*, 175 Ariz. at 602, 858 P.2d at 1205. There was no direct evidence that Goudeau hunted his victims, and the record does not indicate that any such evidence was anticipated when opening statements were made.

¶196      The references during closing argument, on the other hand, were not clearly improper.  Prosecutors are given "wide latitude" in presenting closing argument to the jury.  *State v. Comer*, 165 Ariz. 413, 426, 799 P.2d 333, 346 (1990).  "Unlike opening statements, during closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions."  *Bible*, 175 Ariz. at 602, 858 P.2d at 1205.  In determining whether an argument is misconduct, "we 'consider two factors:   (1) whether the prosecutor's statements called to the jury's attention matters it should not have considered in reaching its decision and (2) the probability that the jurors were in fact influenced by the remarks.'" *State v. Nelson*, 229 Ariz. 180, 189 ¶ 39, 273 P.3d 632, 641 (2012) (quoting *Newell*, 212 Ariz. at 402 ¶ 60, 132 P.3d at 846).  We "look[] at the context in which the statements were made as well as 'the entire record and to the totality of the circumstances.'"  *Id.* (quoting *Rutledge*, 205 Ariz. at 13 ¶ 33, 66 P.3d at 56).

¶197      Given the evidence presented at trial, we find no impropriety in the prosecutor referring to Goudeau—*during closing argument*—as a "wolf" and "a wolf in sheep's clothing."  There was substantial evidence that Goudeau attempted to conceal his identity by wearing disguises and circumstantial evidence that Goudeau stalked some of his victims. Comparing Goudeau to a "wolf" and describing his various disguises as "sheep's clothing," therefore, was consistent with the evidence and fell within the wide latitude permitted prosecutors in arguing to the jury.  *See Nelson*, 229 Ariz. at 190 ¶ 41, 273 P.3d at 642 (finding no prosecutorial misconduct where State's closing argument accurately described the facts of the case); *cf. California v. McDermott*, 51 P.3d 874, 911 (Cal. 2002) (referring to defendant as a "wolf in sheep's clothing," and a person who "stalked people like animals" in closing argument, when considered in the context of the planning and execution of the murder, did not exceed the permissible bounds of argument); *Browning v. State*, 134 P.3d 816, 839 (Okla. Crim. App. 2006) (referring to defendant as a "wolf in sheep's clothing" during guilt phase closing argument was a reasonable inference from the evidence); *Ponce v. State*, 89 S.W.3d 110, 121 (Tex. Ct. App. 2002) (likening defendant to a wolf during closing argument was based on defendant's conduct and thus permissible).

¶198    Although the prosecutor's comments during opening statements were improper, Goudeau has not shown that they caused prejudice sufficient to constitute fundamental error. *See Benson*, 232 Ariz. at 463 ¶ 40, 307 P.3d at 30; *see also Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986) (noting that it "is not enough that the prosecutors' remarks were undesirable or even universally condemned"; to prevail on a prosecutorial misconduct claim, it must be shown that the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process") (internal quotation marks and citation omitted). Goudeau had an opportunity to respond to the prosecutor's comments and in fact did so in his opening statements and closing arguments as well as in his allocution.

¶199    Moreover, any prejudice was ameliorated by the trial court's limiting instructions and the overwhelming proof of guilt. The trial court instructed the jury not to be influenced by sympathy or prejudice and further charged that counsel's opening statements and arguments were not evidence. *See Manuel*, 229 Ariz. at 6 ¶ 24, 270 P.3d at 833 ("[C]autionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements" because we presume that jurors follow the court's instructions).

¶200    In addition, the substantial evidence of guilt, including the DNA evidence, a murder victim's jewelry found in Goudeau's home, and multiple identifications of him as the perpetrator of numerous crimes, reduced the likelihood that the jury's decision was influenced by the prosecutor's statements. *Cf. Comer*, 165 Ariz. at 426–27, 799 P.2d at 346–47 (concluding that prosecutor's characterization of defendant as a "monster" and "filth" during closing argument, though improper, was harmless in light of the overwhelming evidence of guilt). Goudeau has not shown fundamental error.

### 2.  Misstatements of the Law

¶201    Goudeau next argues that "the [S}tate repeatedly misstated the law (without objection) in its closing arguments[,] misleading the jury in turn as to what it could consider in rendering its verdicts." During closing argument in the guilt phase, the prosecutor told the jury that it

could consider the "patterns," and any "evidence that inextricably ties [the defendant] to one of his victims" in determining "his guilt in other crimes, establishing not only his intent, his motive, his MO, but also his identification." Regarding the crimes against sisters Lorena L. and Alejandra L. (Chapter 3), the prosecutor stated:

> You cannot simply say that because the defendant raped the [sisters], he must have done all of the other crimes. That's not fair, that's not the way our law works. The way our law works is in the instructions that Judge Granville just read to you. They tell you precisely how you are to use and not use this type of evidence.. . .
>
> In other words, when you determine it is highly probable that the defendant committed the sexual assaults, for instance, of the [sisters], the law allows . . . that you may consider that evidence in determining his intent, motive, identity, MO, of all the other crimes with which he is charged.
>
> For it is his pattern, his deeds, that reveal him for what he is and what he has done, and the law allows you to look at the totality of the evidence in identifying this about this man.

**¶202** Rule 404(b) expressly allows other-act evidence to prove "identity or absence of mistake or accident." Ariz. R. Evid. 404(b). The prosecutor's statements were consistent with this rule and did not mislead the jury. Additionally, any error did not result in an unfair trial because the jury was properly instructed. *See Newell*, 212 Ariz. at 403 ¶¶ 67–68, 132 P.3d at 847 (holding that jury instructions stating that closing arguments are not evidence negated improper comments of prosecutor); *see also State v. Patterson*, 230 Ariz. 270, 276 ¶ 25, 283 P.3d 1, 7 (2012) (finding prosecutor's initial misstatement of the law cured by jury instructions that properly stated the law).

**¶203** Goudeau also contends that the prosecutor incorrectly defined the standard for mental anguish during closing arguments in the aggravation phase and encouraged the jury to speculate. During closing argument in that phase, the prosecutor stated:

The focus is on the victim's physical pain and mental anguish or suffering that he forced them to endure.  Not just at the moment he pulled the trigger, but from the moment he crossed their path, took possession and control, dominion over their body and their life.  Everything that he forced them to endure in the minutes prior to the way he ended their life.  All of that applies to this factor.  All of this applies, and you know from what you heard in this trial and from your verdicts, what he forced them to endure.  You know it not only from their bodies, and what each of the nine tell you, but also from the living victims.

¶204        "The entire murder transaction, not just the final act, may be considered" in determining the (F)(6) factor.  *McCray*, 218 Ariz. at 259 ¶ 31, 183 P.3d at 510.  The prosecutor did not misstate the law regarding the mental anguish component of especial cruelty, nor did she ask the jury to speculate.  *Cf. Cota*, 229 Ariz. at 151 ¶ 80, 272 P.3d at 1042 ("The prosecutor may argue the facts and reasonable inferences from the evidence at the penalty phase.").  The prosecutor misspoke, however, by implying that the jury could consider what other victims experienced or suffered in determining whether Goudeau's murder of a different victim was especially cruel.  That misstatement, however, did not result in fundamental error because it was not so prejudicial as to deprive Goudeau of a fair trial.

### 3.  Other Arguments

¶205        Goudeau also challenges certain comments made during closing argument in the penalty phase.  First, he asserts that the prosecutor "improperly asked the jurors to consider the fact that he maintained his innocence," in violation of the Fifth Amendment; article 2, section 10 of the Arizona Constitution; and A.R.S. § 13-117(B).

¶206        After halting his mitigation evidence during the penalty phase, Goudeau chose to allocute.  He repeatedly told the jurors that he was "no wolf in sheep clothing" and "no monster."  He blamed his counsel for not presenting a defense for him, expressed hope that the jurors would someday "learn the truth about this case, or the case that [he was] accused

of," and said he was there only because of his past, of which he was not proud. Goudeau remarked that he totally changed his life for the better after serving time in prison, and that he "knew both of those people, both of the victims."[9] Finally, he told the jury that he voluntarily chose to "cancel mitigation."

¶207        In closing argument, the prosecutor stated:

> Not once did this defendant stand before you and comment about the horror he has inflicted. Not once did he talk about what each of these 9 victims endured at his hands.

> Rather, he stood before you and denied responsibility. Guilt is no longer the issue.

¶208        "A prosecutor may not make any comments calculated to point out a defendant's invocation of his Fifth Amendment right." *State v. Burns*, 237 Ariz. 1, 32 ¶ 150, 344 P.3d 303, 334 (2015). We examine a comment on a defendant's silence "in the context of the proceedings as a whole" to determine whether the jury would perceive them as a comment on a defendant's failure to testify. *Id.*

¶209        Viewed in context, the prosecutor's statements reflect an effort to rebut Goudeau's allocution, not a comment on the exercise of his Fifth Amendment right. The prosecutor noted that Goudeau denied responsibility for the crimes even though guilt was no longer at issue, and that the only question was whether Goudeau was "deserving of any leniency at all." This was permissible argument in rebuttal to Goudeau's allocution.

¶210        Goudeau further contends that the prosecutor improperly argued in closing that "[w]e are seeking a just punishment for what this defendant has done . . . to this community, what he [has] done to 9 lives." Prosecutors are given "wide latitude" in closing arguments. *State v. Herrera*,

---

[9]        Goudeau later clarified that the two victims he was referring to in his allocution were from the 1989 crimes, for which he was convicted and served time in prison.

174 Ariz. 387, 396, 850 P.2d 100, 109 (1993).  But "[a] prosecutor exceeds this authority when he uses his remarks to inflame the minds of jurors with passion or prejudice or influence the verdict in any degree."  *Id.* (internal quotation marks and citation omitted).

**¶211**      The prosecutor's statement did not amount to misconduct. The prosecutor noted that Goudeau presented evidence that he would not be dangerous in prison.  The prosecutor then argued, "[w]e are not asking you to impose a death sentence for what this defendant may or may not do in prison."  Rather, the prosecutor said, the State was seeking the death penalty for what the defendant did to the community and his victims.

**¶212**      A prosecutor may properly urge the jury to give more weight to a defendant's crimes than to the mitigation evidence.  *Cf. id.* at 396–97, 850 P.2d at 109–10 (finding prosecutor's statements in closing of the guilt phase about justice and protecting society proper; statements did not improperly urge jurors to convict defendant for reasons irrelevant to his guilt or innocence); *see also State v. Leteve*, 237 Ariz. 516, 528–29 ¶ 47, 354 P.3d 393, 405–06 (2015) ("[T]he state may 'rebut' mitigation—that is, a conclusion that the defendant should be shown leniency—by introducing evidence of the 'specific harm caused by the defendant.'" (quoting *Forde*, 233 Ariz. at 572 ¶ 126, 315 P.3d at 1229)).  Although the prosecutor's reference to the "community" at large was arguably improper, *id.* at 529 ¶ 51, 354 P.3d at 406, that single comment was neither inflammatory nor unduly prejudicial, and Goudeau has not established fundamental error.

### 4.  Cumulative Effect of the Conduct

**¶213**      Even when an instance of prosecutorial misconduct does not warrant reversal, "an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant."  *Roque*, 213 Ariz. at 228 ¶ 155, 141 P.3d at 403 (internal quotation marks and citations omitted).

**¶214**      Although the prosecutor made some improper remarks during eleven of the State's thirteen opening arguments, they did not

amount to persistent and pervasive misconduct that deprived Goudeau of a fair trial. The court twice instructed the jury that attorneys' remarks during opening and closing were not evidence, and we presume that jurors follow instructions. *Manuel*, 229 Ariz. at 6 ¶ 25, 270 P.3d at 833. Any cumulative prejudice resulting from the prosecutor's remarks is insufficient to overcome this presumption. *See State v. Gallardo*, 225 Ariz. 560, 569 ¶ 40, 242 P.3d 159, 168 (2010) (reasoning that similar instructions cured any prejudice).

## N. Finding Multiple Aggravating Factors

**¶215** Goudeau asserts that he was subjected to impermissible double counting of aggravating circumstances, violating his constitutional rights against double jeopardy and cruel and unusual punishment. He further asserts that A.R.S. § 13-751(F)(2)'s contemporaneous prior conviction provision is unconstitutional and that the aggravation instructions were improper. We review de novo whether Goudeau's convictions violate the Double Jeopardy Clause. *State v. McGill*, 213 Ariz. 147, 153 ¶ 21, 140 P.3d 930, 936 (2006). Because a double jeopardy violation would constitute fundamental error, we consider the issue even though Goudeau raised it for the first time on appeal. *See id.*

**¶216** We also review de novo the constitutionality of statutory aggravating circumstances. *Forde*, 233 Ariz. at 569 ¶ 105, 315 P.3d at 1226. Although we ordinarily review de novo whether the trial court correctly instructed the jury on the law, *Burns*, 237 Ariz. at 22 ¶ 83, 344 P.3d at 324, because Goudeau did not object to the aggravation phase jury instructions, we review for fundamental error, *see State v. Gomez* (*Gomez I*), 211 Ariz. 494, 499 ¶ 20, 123 P.3d 1131, 1136 (2005).

**¶217** Each of Goudeau's nine murder convictions was for felony murder, variously predicated on kidnapping, sexual assault, burglary, or armed robbery. Goudeau was convicted of each charged predicate felony for all but two of the murder convictions (Chapter 8—the Roman and Vargas murders, in which the jury acquitted Goudeau of the predicate

felony charges of attempted armed robbery).[10]   At the close of the aggravation phase, the trial court instructed the jury that in considering the (F)(2) aggravator, it had to find that the "[d]efendant has been convicted of a 'serious offense', either in this trial or at another court proceeding." *See* A.R.S. § 13-751(F)(2). The jury found the (F)(2) aggravator satisfied for each murder conviction.

### 1. Using the same facts as felony-murder predicates, (F)(2) aggravators, and separately punished crimes is constitutional.

#### a. Double Jeopardy

¶218      Goudeau asserts that using the same felonies three times in the sentencing calculus violates the Double Jeopardy Clause of the Fifth Amendment. This argument fails, however, because the predicate felonies to the felony-murder convictions were not the only prior convictions supporting the (F)(2) aggravator in this case. The State presented evidence of five serious offense convictions from 1989 and 1990, as well as Goudeau's prior convictions for the crimes against sisters Lorena L. and Alejandra L.

¶219      Goudeau's claim also fails on the merits. We have rejected the argument that double jeopardy prohibits a court from sentencing a defendant to prison for the same felonies used as felony murder predicates and capital sentencing aggravators. *See Burns*, 237 Ariz. at 22 ¶ 86, 23 ¶ 88, 344 P.3d at 324, 325.

#### b. Eighth Amendment

¶220      Goudeau next contends that the (F)(2) aggravator violates the Eighth Amendment by failing to genuinely narrow the class of death-

---

[10]      Despite this, sufficient evidence supported an implicit finding that Goudeau committed burglary and kidnapping against victims Roman and Vargas, thus authorizing the felony-murder convictions as to them, a point Goudeau does not contest. *See State v. Lacy*, 187 Ariz. 340, 345, 349, 929 P.2d 1288, 1293, 1297 (1996) (finding sufficient evidence of predicate crime of burglary to support felony-murder convictions, although burglary charge previously was dismissed).

eligible defendants if the contemporaneously committed predicate crime supporting a felony-murder conviction may also be used as a prior serious felony conviction. *See* U.S. Const. amend. VIII. Goudeau acknowledges that we rejected a similar challenge to the (F)(2) aggravator in *Forde*, 233 Ariz. at 569 ¶¶ 105–07, 315 P.3d at 1226; *see also State v. Carlson*, 237 Ariz. 381, 395 ¶¶ 45, 47–48, 351 P.3d 1079, 1093 (2015). The (F)(2) aggravator is constitutional.

### 2. The trial court did not commit fundamental error by failing to instruct the jury that it could not consider the same fact to prove multiple aggravating factors.

**¶221**        The State properly presented evidence that Goudeau had been convicted of multiple serious offenses to prove the (F)(2) aggravator. *See Morris*, 215 Ariz. at 341 ¶ 78, 160 P.3d at 220. Goudeau nonetheless contends that the absence of any jury instruction that jurors could only consider the multiple serious offenses once in the sentencing decision was structural error. He relies on *State v. Lynch* (*Lynch I*), 225 Ariz. 27, 234 P.3d 595 (2010), in which we held that the trial court's erroneous instruction that the (F)(6) aggravator was three separate aggravating factors and the prosecutor's highlighting of that instruction during arguments constituted reversible error. *Id.* at 42–43 ¶¶ 84–88, 234 P.3d at 610–11.

**¶222**        Goudeau's reliance on *Lynch I* is misplaced. Unlike the jury in *Lynch I*, the jury here was not instructed that it could find multiple aggravating factors for each serious offense, and the State did not argue that it could. On the contrary, the State correctly argued that the seventy-five prior serious offenses are "not [seventy-five] separate aggravating factors," but rather constitute "one aggravating factor." Goudeau has not established fundamental error.

### O. Rebuttal Evidence to Mitigation

**¶223**        Goudeau called one witness during the penalty phase, mitigation expert Dr. Mark Cunningham. Dr. Cunningham opined that Goudeau would have a positive adjustment to prison if sentenced to a life term and would pose a low likelihood of violence. Dr. Cunningham further opined that Goudeau deserved leniency because several adverse

developmental factors shaped Goudeau's decision-making ability and value system.

**¶224** In rebuttal to Dr. Cunningham's mitigation testimony, the State sought to introduce into evidence transcripts from interviews it conducted with two of Goudeau's sisters, Wilma Jean Belt and Sharon Goudeau, whom Dr. Cunningham had also interviewed in forming his opinion. Goudeau objected, but he acknowledged that the sisters' interviews related to his family background and that defense counsel attended those interviews. The trial court overruled the objection and thereafter admitted the sisters' interview transcripts without further objection.

**¶225** After Dr. Cunningham's testimony concluded, Goudeau chose to allocute. In his allocution, Goudeau expressed remorse for the crimes he committed in 1989 and indicated that he changed after being in prison. In rebuttal to Goudeau's allocution, the State sought to introduce into evidence a transcript from a 2004 parole board hearing during which Goudeau was granted parole. Over Goudeau's general objection, the court admitted the transcript.

**¶226** "Admissibility of the rebuttal evidence turned on whether it was relevant to the existence of mitigation sufficiently substantial to call for leniency, A.R.S. § 13-752(G), and, if so, whether the evidence was unfairly prejudicial." *Forde*, 233 Ariz. at 571 ¶ 118, 315 P.3d at 1228; *see also Leteve*, 237 Ariz. at 528–29 ¶ 47, 354 P.3d at 405–06 (noting that under A.R.S. §§ 13-751(G) and 13–752(G), the state may introduce relevant evidence whether or not the defendant presents evidence during the penalty phase and thus "may 'rebut' mitigation—that is, a conclusion that the defendant should be shown leniency") (internal quotation marks and citation omitted). Although "[t]he Rules of Evidence do not apply to the admission of evidence during the penalty phase of a capital trial," *Burns*, 237 Ariz. at 28 ¶ 130, 344 P.3d at 330, the trial court's analysis in determining relevance under § 13-751(C) "involves fundamentally the same considerations as does a relevancy determination under Arizona Rule of Evidence 401 or 403," *McGill*, 213 Ariz. at 157 ¶ 40, 140 P.3d at 940.

**¶227** Goudeau argues that the transcripts of his sisters' interviews,

though "marginally relevant," "also included highly inflammatory matters including what Goudeau purportedly told his sister[s] about his involvement in his prior criminal offenses and lack of acceptance of responsibility for [those offenses, which] . . . are irrelevant considerations and rebutted nothing in this case."

¶228 Because Goudeau did not object to the admission of the sisters' interview transcripts on the ground that they contained inflammatory content, we review for fundamental error only. *See State v. Neal*, 143 Ariz. 93, 100, 692 P.2d 272, 279 (1984). We find no error in the trial court's admission of the transcripts, much less fundamental error. The court relied on defense counsel's characterization of the scope of the transcripts as pertaining to Goudeau's family background. So characterized, they were relevant to rebut Dr. Cunningham's mitigation testimony on that topic.

¶229 Moreover, because Dr. Cunningham based his opinion in part on his own interviews with Goudeau's sisters, the transcripts from the State's interviews with them were relevant inasmuch as they provided further context for Dr. Cunningham's conclusions. Any prejudicial impact of the brief references in the transcripts to Goudeau's time in prison and what he had told his sisters about his prior crimes did not outweigh the transcripts' probative value. In addition, the State did not mention in closing argument that portion of the sisters' interviews to which Goudeau now objects.

¶230 Regarding the 2004 parole board transcript, Goudeau argues that the court erred by admitting it because the transcript "failed to rebut the 'thrust' of [his] mitigation" and was unfairly prejudicial. We review the admission of evidence in the penalty phase for abuse of discretion. *Nordstrom III*, 230 Ariz. at 114 ¶ 8, 280 P.3d at 1248.

¶231 "Defendants may not 'shift a mitigating circumstance . . . [into] allocution and thereby insulate that mitigating circumstance from rebuttal evidence.'" *Chappell*, 225 Ariz. at 238 ¶ 32, 236 P.3d at 1178 (quoting *State v. Armstrong*, 218 Ariz. 451, 463 ¶ 59, 189 P.3d 378, 390 (2008)). The thrust of Goudeau's allocution was that he had learned from his time in prison for prior crimes, that the only reason he was on trial in this case was

because of that criminal history, and that he deserved leniency because the State had misrepresented his character. Similarly, the thrust of Goudeau's statements to the parole board was that his time in prison had changed him for the better and that he would work conscientiously so as not to return to prison. For example, Goudeau told the parole board:

> [C]om[ing] to prison like I told you it was one of the lowest part of my life. . . . [B]ut is also was my highest because then I began to realize . . . how – how many people I did hurt. . . . I mean no one should have to go through that and I'm aware of that. . . . I have no excuse for it because it was my choice using drugs. But I can assure you that I would never use drugs or alcohol again. I would never harm anyone. . . . I can assure you this is a place that will never see me again. Um, I know what I have to do to stay out of here or . . . I would never ever hurt my family or myself. I would never hurt anybody again in my life.

**¶232** The parole board transcript was relevant to rebut Goudeau's allocution that he had in fact learned from his time in prison. The State presented evidence that he later committed and was convicted of the crimes against the sisters, Alejandra L. and Lorena L. The transcript was also relevant to show that Goudeau asked for and received leniency in the past, and having been granted parole, he violated the parole board's trust by assaulting the sisters and committing the crimes of which he was found guilty in this case. *See* A.R.S. § 13-752(G) ("[R]egardless of whether the defendant presents evidence of mitigation, the state may present any evidence that demonstrates that the defendant should not be shown leniency including any evidence regarding the defendant's character, propensities, criminal record or other acts."); *Leteve*, 237 Ariz. at 528–29 ¶ 47, 354 P.3d at 405–06 ("During the penalty phase, the state may offer evidence that is relevant to determining if the mitigation is sufficiently substantial to warrant leniency."). Any prejudicial impact of the parole hearing transcript's details of his prior crimes did not outweigh the transcript's probative value, and the trial court did not abuse its discretion by admitting it.

### P. Waiver of Mitigation

¶233        Goudeau makes three claims related to his waiver of mitigation: that his waiver was not knowing, voluntary, and informed; that he could not override his attorneys' decision to present mitigation; and that the Sixth and Eighth Amendments preclude waiver. We review a trial court's determination that a defendant has knowingly, intelligently, and voluntarily waived mitigation for abuse of discretion. *Cf. Gunches*, 225 Ariz. at 24 ¶ 8, 234 P.3d at 592 (reviewing waiver of counsel). Because Goudeau did not raise his constitutional challenges to waiver below, we review for fundamental error. *See Carlson*, 237 Ariz. at 393 ¶ 38, 351 P.3d at 1091; *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶234        After his convictions in the guilt phase, Goudeau told the trial court that he wanted to waive his appearance from further proceedings. The court engaged Goudeau in a colloquy, describing the aggravation and penalty phases of trial and explaining that he could change his mind at any time. The court determined that Goudeau knowingly, intelligently, and voluntarily waived his appearance in the aggravation and penalty phases. Because Goudeau also indicated his desire to waive mitigation, the court ordered him to undergo a Rule 11 competency evaluation. When Goudeau refused the evaluation, the court concluded based on "hundreds of hours" of observations and reports from a previous Rule 11 evaluation that Goudeau was competent to waive mitigation.

¶235        The court then discussed at length with Goudeau the role of mitigation and his right to present such evidence. Goudeau responded that he still did not "really" understand the substance of his mitigation, at which point the court recessed so that Goudeau could review the mitigation with his counsel and make an "educated decision." The court told Goudeau: "We will take whatever time that you need and, counsel, I rely on you to tell me when you are ready."

¶236        When they returned within fifteen minutes, the court asked Goudeau whether he had enough time to think and talk about what he wanted to do with counsel. Goudeau replied:

> I haven't really had enough time to think about it, but I have decided I am not going to go through with it. I mean, it is just thrown together documentations that I still disagree with, so

—but I — he gave me a run through of what, you know, the steps is but I don't wish to go any farther.

Goudeau confirmed that he understood his right to present mitigation and that his attorneys were prepared to present mitigation on his behalf. The court recessed again so that Goudeau could discuss whether to waive mitigation with Phil Tower, his civil attorney. Goudeau then informed the court that he would proceed with mitigation "this week."

¶237    When presentation of mitigation evidence began a week later, defense counsel first called Dr. Cunningham, and Goudeau decided to attend the proceedings. Shortly into Dr. Cunningham's second day of testimony, however, Goudeau told the court that he wanted to stop mitigation. Goudeau confirmed that he had not had any drugs, alcohol, or medicine in the last twenty-four hours, nor had he been prescribed any medications that he had refused to take. The court explained that Dr. Cunningham had not finished his direct testimony and would still be subject to the State's cross-examination. The court then took a recess so that Goudeau could confer with his lawyers and decide what to do.

¶238    After the short meeting, defense counsel informed the court that Goudeau still wished to waive mitigation and further requested that Dr. Cunningham's testimony be stricken. The court denied the motion to strike. The court then went through a brief colloquy with Goudeau in which he confirmed that he wanted to entirely stop the mitigation case. Defense counsel made a renewed motion for a Rule 11 evaluation, which the court denied, finding "no basis" for it because Goudeau "has been, again, completely focused on time and space and responsive to all of my questions today." Later that day, Goudeau told the court that he did not wish to testify, but did want to exercise his right to allocution.

¶239    Following the State's cross-examination of Dr. Cunningham, Goudeau also waived any rebuttal testimony and instead provided the jury with stipulated facts about his prior convictions. Defense counsel again moved for a Rule 11 evaluation, which the court denied. Before closing arguments, the trial court instructed the jury that it was not limited to considering mitigating circumstances offered by the defendant; it must consider any relevant mitigating evidence presented during any phase of

the trial, and each juror must individually determine whether the mitigation was sufficiently substantial to call for leniency.

### 1. Goudeau knowingly, voluntarily, and intelligently waived mitigation.

**¶240** "A defendant may waive mitigation if he is competent and makes the decision knowingly, intelligently, and voluntarily." *Hausner*, 230 Ariz. at 84 ¶ 116, 280 P.3d at 628. In *Hausner*, we set forth the procedures for trial courts to "prospectively appl[y] when a capital defendant elects to waive the presentation of all mitigation," to ensure that waivers are made on an informed and voluntary basis. *Id.* at 86 ¶ 122, 280 P.3d at 630.

**¶241** Although the proceedings here occurred before *Hausner* was decided, the trial court took many of the steps recommended in *Hausner*. The court engaged Goudeau in a colloquy to ensure that he understood the role of mitigation and the consequences of waiver; held recesses to allow Goudeau to speak with counsel and review the mitigation evidence; and confirmed on the record that Goudeau was competent to waive and knowingly, voluntarily, and intelligently did so. Although some of the discussion occurred eight days before Goudeau ultimately waived mitigation, Goudeau knew about the witnesses and potential testimony that he was forgoing and told the court that he had had enough time to consider his decision.

**¶242** Contrary to Goudeau's contentions on appeal, there is no indication that his decision to waive mitigation resulted from a complete breakdown in communication with counsel. Although he voiced frustrations with his counsel, he reviewed the mitigation evidence and discussed waiver with counsel before making his decision. Asked by the trial court to explain his decision to waive, Goudeau responded: "Judge, I am 100 percent innocent and I cannot sit here and listen to this any more, you know. I wish my defense team would have gave me the same type of defense during the guilt[] phase, we wouldn't even be at this point, you know."

**¶243** Goudeau's waiver of his right to present mitigation was voluntary, knowing, and informed. *See State v. Joseph*, 230 Ariz. 296, 300–01

¶¶ 22–24, 283 P.3d 27, 31–32 (2012) (concluding that trial court's explanation of mitigation and penalty phase, coupled with defendant's statements, demonstrated that he voluntarily, knowingly, and intelligently waived mitigation).

**2. Defense counsel is not required to present mitigation over the defendant's objection.**

**¶244** Goudeau asserts that "[a] represented defendant has no right to veto his lawyers' strategic decision to present mitigation evidence and permitting so violates the Sixth and Fourteenth Amendments." In a related argument, Goudeau contends that the Sixth and Eight Amendments prohibit capital defendants from waiving mitigation. We reject these arguments.

**¶245** The United States Supreme Court rejected the argument that the Eighth Amendment precludes capital defendants from waiving mitigation in *Blystone v. Pennsylvania*, 494 U.S. 299, 307–08 (1990). Although the defendant there waived the presentation of mitigation, the Supreme Court held that the sentencing procedures did not violate the Eighth Amendment because, as here, the jury was specifically instructed to consider any mitigation evidence presented at trial in deciding on the penalty. *Id.* at 306–08.

**¶246** Nor does the Sixth Amendment require the defense to present mitigation despite the defendant's waiver. As we explained in *Hausner*, "requiring the defense to present mitigating evidence over the defendant's opposition arguably would conflict with the defendant's Sixth Amendment right to self-representation." 230 Ariz. at 85 ¶ 119, 280 P.3d at 629. Although a minority of courts have held that mitigation must be presented even over the defendant's objection, we have found "more persuasive the majority of courts that . . . have held that a capital defendant may waive the presentation of mitigation." *Id.* at ¶ 120.

## IV. ABUSE OF DISCRETION REVIEW

**¶247** Because Goudeau committed the murders after August 1, 2002, we review the jury's findings of aggravating circumstances and the imposition of death sentences for abuse of discretion, A.R.S. § 13-756(A),

viewing the facts in the light most favorable to sustaining the verdicts, *Naranjo*, 234 Ariz. at 249 ¶ 81, 321 P.3d at 414. "A finding of aggravating circumstances or the imposition of a death sentence is not an abuse of discretion if 'there is any reasonable evidence in the record to sustain it.'" *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36, 250 P.3d 1131, 1137 (quoting *Morris*, 215 Ariz. at 341 ¶ 77, 160 P.3d at 220).

## A. Aggravating Circumstances

**¶248**      Goudeau argues that the State presented insufficient evidence of the (F)(6) aggravator in eight of the nine murders and that the (F)(2) aggravator is unconstitutional. For the reasons discussed above, we reject those arguments. *See supra* ¶¶ 182–91, 216–22. Goudeau also argues that the State presented insufficient evidence of the (F)(8) aggravator with respect to Chao Chou and Liliana Sanchez. Goudeau does not challenge the jury's findings on the other aggravating circumstances, A.R.S. §§ 13-751(F)(1) and -751(F)(7).

### 1. Sufficiency of Evidence for (F)(8) Finding

**¶249**      The (F)(8) aggravator exists if "[t]he defendant has been convicted of one or more other homicides . . . that were committed during the commission of the offense." A.R.S. § 13-751 (F)(8). To satisfy this factor, "the homicides must be temporally, spatially, and motivationally related, taking place during 'one continuous course of criminal conduct.'" *State v. Prasertphong* (*Prasertphong II*), 206 Ariz. 167, 170 ¶ 15, 76 P.3d 438, 441 (2003) (quoting *State v. Rogovich*, 188 Ariz. 38, 45, 932 P.2d 794, 801 (1997)). It is not enough that the jury convicted the defendant of multiple homicides occurring around the same time. *Id.*

**¶250**      The evidence at trial showed that on March 14, 2006, Chou offered to give Sanchez a ride home after work and the two left together in Chou's car. Chou was later found dead in an alley with a gunshot wound to his head. Sanchez was found dead in the front passenger seat of Chou's car, about one mile from the alley, with a gunshot wound to her head. Her shirt was pulled up and her pants unbuckled and partially unzipped. The evidence further showed that both victims were shot by someone seated in the back seat. There was also some evidence that the victims had been

robbed.

**¶251** The jury could reasonably infer that Goudeau, while seated in the back seat, kidnapped and robbed Chou and Sanchez at gunpoint, and killed them to facilitate his plan to rob them, sexually assault Sanchez, or eliminate witnesses. The evidence was sufficient to support a finding that the murders were motivationally related and took place in a continuous course of criminal conduct.

## B. Death Sentences

**¶252** We will overturn a jury's imposition of a death sentence only if "no reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Cota*, 229 Ariz. at 153 ¶ 95, 272 P.3d at 1044 (internal quotation marks and citation omitted).

**¶253** During trial, Goudeau presented limited mitigation evidence through Dr. Cunningham that he suffered from adverse developmental factors that affected his culpability, including "probable fetal alcohol exposure," learning disorders, genetic predisposition to substance abuse and psychological disorders, neglect, inadequate supervision, and exposure to community violence and drug abuse. Dr. Cunningham further opined that Goudeau would not pose a danger in prison.

**¶254** The State cross-examined Dr. Cunningham and presented evidence to rebut the alleged mitigating factors. The jury did not find the proffered mitigation sufficiently substantial to call for leniency. *See* A.R.S. §§ 13-751(C), (E); -752(G).

**¶255** The jury could have properly found Goudeau's mitigation evidence and any other evidence presented at trial insufficient to warrant leniency. The jury did not abuse its discretion in finding death sentences appropriate for each of the nine murders. Because we find no error, we need not address Goudeau's remaining argument that it is unconstitutional to review death penalty sentences for harmless error.

## C. CONCLUSION

75

¶256        Based on the foregoing, we affirm Goudeau's convictions and sentences.[11]

_____

[11]    Stating that he wishes to preserve certain issues for federal review, Goudeau lists nineteen constitutional claims and previous decisions rejecting them.  We decline to revisit those claims.